**PAN–ISLAMIC TRADE CORPORATION, Plaintiff–Appellant,**

v.

**EXXON CORPORATION et al., Defendants–Appellees.**

No. 78–1518.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1980.

Benton Musslewhite, Houston, Tex., Louis R. Koerner, Jr., New Orleans, La., for plaintiff–appellant.

Cloy D. Monzingo, Houston, Tex., for Getty.

Hurst K. Groves, New York City, for Mobil.

Robert L. Norris, Jr., San Diego, Cal., for Exxon & Standard.

Joseph P. Foley, White Plains, N. Y., Jack D. Childers, Houston, Tex., for Texaco.

B. J. Bradshaw, Houston, Tex., for Amerada Hess.

John S. Kingdon, Washington, D. C., William Simon, Stuart H. Harris, W. G. Winters, Jr., Houston, Tex., for Shell.

Thomas H. Burton, Houston, Tex., for Continental.

Harry M. Reasoner, Max Hendrick, III, Houston, Tex., for Mobil and Exxon.

Morris Harrell, Stan McMurry, Dallas, Tex., for Phillips.

Maurice R. Glover, Chicago, Ill., for Standard & American Oil.

Dean J. Capp, James M. Appelt, Houston, Tex., for American Oil.

Larry F. York, Houston, Tex., for Occidental Petroleum.

E. William Barnett, Houston, Tex., for Tenneco.

Robert M. Dubbs, Radnor, Pa., for Sun Oil.

Alan S. Gover, L. Denman Moody, Houston, Tex., for Atlantic Richfield & Getty Oil.

James A. Drexler, Houston, Tex., for Exxon.

William N. Armstrong, Houston, Tex., for Tenneco.

Before COLEMAN, Chief Judge, REAVLEY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Pan–Islamic Trade Corporation ("Pan–Islamic") brought suit against sixteen oil companies,[1] claiming that it was prevented from selling Algerian crude oil which it had purchased from Sonatrach, the national oil company of Algeria, as a result of an unlawful worldwide boycott and conspiracy against Algerian oil entered into by the defendant oil companies. Pan–Islamic alleged violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and tortious interference with contract rights. During the course of the litigation below, Pan–Islamic moved for, but was denied, leave to file an amended complaint. After discovery, the trial court, in a decision reported at 1976–2 Trade Cas. ¶ 61,024 (S.D. Tex.1976), granted all the defendants' motions for summary judgment with respect to all claims. The issues we must decide on this appeal are (1) whether leave to amend should have been granted, (2) whether discovery was improperly limited, and (3) whether summary judgment should have been granted the defendants with respect to the Section 1 Sherman Act claim.[2] We affirm the trial court's decision in all respects.

I. Preliminary Facts

Pan–Islamic's story is that of a small group of businessmen daring to obtain the immense fortune promised by world crude oil trade, only to be frustrated either by their own inexperience in failing to appreciate market prices, and thus contracting with Sonatrach at too high a price, as argued by the defendant oil companies, or by an illegal conspiracy to boycott Algerian crude oil, as alleged by Pan–Islamic.

---

1. Amerada Hess Corporation ("Amerada Hess"), Amoco Oil Company ("Amoco"), Atlantic Richfield Company ("Atlantic Richfield"), Commonwealth Oil Refining Company, Inc. ("Commonwealth"), Continental Oil Company ("Continental"), Exxon Corporation ("Exxon"), Getty Oil Company ("Getty"), Gulf Oil Corporation ("Gulf"), Mobil Oil Corporation ("Mobil"), Occidental Petroleum Corporation ("Occidental"), Phillips Petroleum Company ("Phillips"), Shell Oil Company ("Shell"), Standard Oil Company (Indiana) ("Standard"), Sun Oil Company (Delaware) ("Sun"), Tenneco, Inc. ("Tenneco"), and Texaco, Inc. ("Texaco").

Commonwealth was dismissed as a party to this suit for lack of jurisdiction of the person.

2. Because Pan–Islamic does not discuss either in its brief or in oral argument the trial court's holding on its claim of tortious interference and on the Section 2 Sherman Act claim, these claims are considered abandoned. Fed.R. App.P. 28(a)(4); *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438 (5th Cir. 1980).

Pan–Islamic was organized on April 29, 1971, by five individuals who had no experience whatsoever in buying or selling crude oil. Mr. Erkan Icsel, a steamship agent, became president of the corporation; Mr. Terrence Clark, a former salesman and employee of the National Maritime Union, and Mr. Walter Wantschek, a salesman for a company conducting job training programs, became vice–presidents; Mr. Gerald Goodwin, who had a business supplying unionized temporary labor to shippers, became secretary–treasurer; and Mr. Benton Musslewhite, a practicing attorney, became its attorney and a stockholder.

The impetus to form Pan–Islamic came in early 1971, when Mr. Jeffrey V. Miller, a Dallas crude oil broker, telephoned Icsel requesting his help in obtaining forty million barrels of Algerian crude oil for sale to Miller's unspecified European client at a price of approximately $3.12 per barrel.[3] On the basis of Miller's telephone call and information obtained from Sonatrach that crude oil might be available at $3.05 per barrel f. o. b. Algeria, the Pan–Islamic principals formed their business venture.

To aid it in negotiations, Pan–Islamic hired as a consultant Mr. Charles Ragan, an attorney with brief experience in structuring crude oil contracts but with no previous participation in the actual purchase or sale of crude oil. In early May, 1971, Musslewhite and Ragan traveled to Algeria to negotiate with Sonatrach. Pan–Islamic entered these negotiations ill–prepared. Its principals had determined neither the posted price,[4] the market price f. o. b. of Algerian crude, the market price of crude delivered to American harbors, nor the transpor-

tation costs of crude from Algeria to the United States. Instead, Musslewhite and Ragan were prepared to negotiate a contract on the basis of a tentative offer of $3.12 per barrel f. o. b. Algeria from Miller despite not having ascertained Miller's authority to speak for his principal, not having an absolutely firm commitment from Miller's principal,[5] not knowing the identity of his principal, and not making a credit check to determine whether Miller or his principal had sufficient funds to purchase the oil.

While in Algeria, Musslewhite received a telex from Icsel informing him that a second party, Coastal States Gas Producing Company ("Coastal States"), might be interested in purchasing forty million barrels of oil. There is nothing in the record to indicate the extent of Coastal States' interest and it is clear that when the contract with Sonatrach was consummated, there was no firm agreement with Coastal States.

Despite having no firm contract with Miller's principal and with Coastal States, and not having investigated current market prices, on May 14, 1971, Pan–Islamic executed a contract with Sonatrach that obligated it to purchase eighty million barrels of crude oil at $2.98 per barrel f. o. b. Algeria to be lifted over a twelve month period beginning with the contract date. Pan–Islamic also received an option to purchase forty million barrels each year thereafter for the next four years. Pan–Islamic had a guarantee of the price of $2.98 per barrel through June 30, 1972, for a maximum of forty million barrels. The option thereafter linked the contract price to the

---

3. There is no clear indication in the record as to why Miller approached Icsel with this request. At that time, Icsel was active in promoting freight between the U.S. Gulf and African ports. In this capacity he had had several contacts with Sonatrach in soliciting freight other than oil.

4. As explained by Prof. Helmut Frank, affiant for Pan–Islamic, posted prices in 1971 were chiefly intended to serve as a tax reference price and should not be confused with market prices although the posted price would be one factor in setting a floor below which market

price could not drop. The defendant oil companies in interrogatories state that there is no relationship between posted prices and the market price paid, an assertion Pan–Islamic does not dispute.

5. Some of Pan–Islamic's principals thought they had a firm commitment while others did not think so. The only document in the record suggesting a firm commitment is a purported communication, undated, from Miller agreeing to purchase 40,000,000 barrels of Algerian crude subject to confirmation of availability.

posted price at Bejaia,[6] with a limitation in the contract price to 60% of the variations in the posted price.

Shortly after the contract with Sonatrach was consummated, Musslewhite learned the identity of Miller's principal, Mr. Kroening, and contacted him concerning a sale. Kroening indicated that the price Pan–Islamic was asking was too high. Because of the continuing inability of Pan–Islamic and Kroening to agree upon price, the transaction promised by Miller's contact never came to fruition.

Similarly, Pan–Islamic was unable to complete negotiations with Coastal States for a resale of its Algerian crude oil. Coastal States offered to purchase 24,000,-000 barrels at $2.55 per barrel, and later made a second offer at $2.70 per barrel, but both offers were rejected by Pan–Islamic.

After the transactions with Coastal States and Miller's principal failed to materialize, Pan–Islamic entered negotiations in June with a company named Petroco for the lifting of 25,000 barrels of Algerian crude per day. The principals of Pan–Islamic disagree among themselves as to whether a contract with Petroco was ever consummated. It is undisputed that Petroco did not take delivery of any oil at the appointed time.

Also during June, Pan–Islamic began an effort to sell its crude oil to the defendant oil companies and others.[7] How many of the defendant oil companies were ever contacted by Pan–Islamic and what offers Pan–Islamic made to those contacted are matters which we shall discuss in detail below. No one ever purchased Pan–Islamic's Algerian crude oil.

The parties to this suit dispute when Pan–Islamic's contract with Sonatrach terminated. The defendant oil companies claim the contract was terminated by July 27, 1971. The record shows that on June 9, 1971, Sonatrach notified Pan–Islamic that Pan–Islamic's failure to withdraw the required quantity of oil was in violation of the contract. On June 17, 1971, Sonatrach informed Pan–Islamic that as a result of the breach, Sonatrach considered itself released from the contract. A subsequent telex dated July 27, 1971, confirmed Sonatrach's position.

Pan–Islamic claims that the contract was not terminated on July 27 but that it was able in August to renegotiate the price from Sonatrach down to approximately $2.84 per barrel f. o. b. Algeria. It is clear that by September or October, 1971, Pan–Islamic' contract with Sonatrach was terminated.

On April 3, 1974, Pan–Islamic filed this suit against the defendant oil companies. The complaint is sparse, conclusory and inartfully drafted. The only claim which is relevant to this appeal concerns an alleged conspiracy to boycott the crude oil purchased by Pan–Islamic. The complaint alleges a French–sponsored boycott of Algerian crude oil in response to the Algerian government's partial nationalization of French oil interests in Algeria. It alleges that each of the defendant oil companies participated in this boycott both by express and implied agreement. Although the complaint did not so indicate, it was clear from the evidence submitted by Pan–Islamic that it was relying heavily on the theory of conscious parallelism to establish an inference of conspiracy.

The trial court granted summary judgment to all the defendants on all claims. It found that the evidence submitted to Pan–Islamic concerning the existence of a French–sponsored boycott to be inadmissible hearsay. With respect to eleven of the defendants,[8] the trial court granted summa-

---

**6.** The posted price at Bejaia is determined according to a formula agreed upon among the Libyan government and oil company representatives meeting at Tripoli.

**7.** There is no explanation as to why some companies allegedly contacted were not made parties to this suit.

**8.** Amerada Hess, Amoco, Atlantic Richfield, Continental, Getty, Gulf, Mobil, Occidental, Phillips, Standard (Indiana), and Tenneco.

ry judgment on the ground that there was no evidence that anyone representing Pan–Islamic had ever contacted any responsible official concerning the Algerian crude. Summary judgment was granted to the remaining four defendants, Texaco, Shell, Exxon and Sun, on grounds that each had acted unilaterally in refusing Pan–Islamic's offer because the asking price for the Algerian crude was noncompetitive. We affirm.

II. Amended Complaint

Approximately nine months after its original complaint had been filed, Pan–Islamic filed a motion for leave to amend its complaint. Count I of the proposed amended complaint contained essentially the same allegations and causes of action as in the original complaint. Count II of the proposed amended complaint, though, would have considerably broadened the suit.[9]

Count II, like the original complaint, is cursory. It alleges additional violations of the antitrust laws under § 4 and § 8 of the Clayton Act, 15 U.S.C.A. §§ 15 and 19, and under § 1 and § 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. In Count II, Pan–Islamic claims that the defendant oil companies have contracted, combined and conspired in restraint of trade and have monopolized and attempted to monopolize the following operational areas of the petroleum industry:

1. Exploration and production of crude oil;
2. Transportation of crude oil;
3. Refining crude oil;
4. Transportation of refined petroleum products; and
5. Marketing of refined petroleum products.

Pan–Islamic in a conclusory allegation asserts that as a result of the above alleged violations, it was not able to sell its crude oil to the defendant oil companies or to others. In a series of additional conclusory allegations, Pan–Islamic charges the oil companies with manipulation in the exploration, production, and refining of crude oil. There is no factual allegation as to how this manipulation was accomplished. There is no allegation as to the purpose, substance, or understanding of the alleged § 1 conspiracy to restrain trade. The only factual allegation in Count II is that the oil companies have employed an attorney and have met under the guise of two groups of oil companies, the New York Policy Group and the London Policy Group, for the purpose of establishing a unilateral policy on Middle Eastern, Algerian, and Libyan oil. Pan–Islamic nowhere alleges how its injury was proximately caused by these alleged activities.

The district court refused to grant leave to file the amended complaint on grounds that Pan–Islamic had no standing under the amended complaint. The trial court reasoned that Pan–Islamic had failed to allege facts sufficient to show the injury it suffered was by reason of the defendant oil companies' conduct, as required under 15 U.S.C.A. § 15. It found that Pan–Islamic had failed to allege facts showing that the asserted conduct was the proximate cause of its asserted injury and that any damages are not merely incidental, consequential, or so removed from the injury as to be only remotely causative. The trial court also concluded that the defendants would be subjected to hardship and prejudice if the filing of the amended complaint were allowed and if Pan–Islamic were permitted to pursue massive discovery into every phase of the defendants' worldwide oil operations.

Fed.R.Civ.P. 15(a)[10] provides that a trial court is to grant amendments "freely

---

9. Since the only new allegations within the amended complaint are in Count II, we focus our attention on this part of the amended complaint.

10. Fed.R.Civ.P. 15(a) reads in full:

(a) Amendments. A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and

when justice so requires." Appellate review is restricted to determining whether the trial court abused its discretion in granting or denying leave to amend. *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 771 (1971); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Henderson v. United States Fidelity & Guaranty Co.*, 620 F.2d 530 (5th Cir. 1980). The trial court can consider many factors in exercising its discretion, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment . . . ." *Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230; *Henderson v. United States Fidelity & Guaranty Co.*, 620 F.2d at 534. The trial court can also examine whether undue prejudice to the movant will result from denying leave to amend. *Henderson v. United States Fidelity & Guaranty Co.*, 620 F.2d at 534. Clearly, if a complaint as amended is subject to dismissal, leave to amend need not be given. *DeLoach v. Woodley*, 405 F.2d 496 (5th Cir. 1969); *Byrne v. Kysar*, 347 F.2d 734 (7th Cir. 1965), *cert. denied*, 383 U.S. 913, 86 S.Ct. 902, 15 L.Ed.2d 668 (1966).

■ We hold that the trial judge, in denying leave to amend, did not abuse his discretion for two reasons. The bulk of Count II was clearly subject to dismissal because Pan–Islamic failed to allege facts indicating standing to sue with respect to most, if not all, of the claims alleged in Count II. Those claims in Count II for which Pan–Islamic may have had standing to sue were adequately raised in its original complaint.

■ Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (West 1973), which reads,

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.[11]

has been construed to impose a standing requirement on antitrust civil litigants. Not simply anyone arguably injured by an antitrust violation may bring suit. Even though an individual may suffer a pocketbook injury, he must be the "target" of the anti–competitive practice before he may sue. *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975). The Supreme Court has noted with approval that "[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, n.14, 92 S.Ct. 885, 891, n.14, 31 L.Ed.2d 184 (1972).

*Jeffrey* explained the "target area" test of standing as follows:

The 'target area' test arose as a means of limiting the class of potential treble–damage plaintiffs to those persons who could most adequately vindicate the purposes of the antitrust laws. To attain standing a person (whether corporation or individual) must be one against whom the conspiracy is aimed. Or, put in plutonomic terms, the complainant must show

leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

11. This section of the Clayton Act is notably different from § 16, 15 U.S.C.A. § 26, which provides for injunctive relief. The Supreme Court, in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), discusses the different rules and policies behind these two standing provisions. Because Pan–Islamic does not request injunctive relief, we need not address the question of standing under § 16.

that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry. 518 F.2d at 1131. An important rationale for this rule is to prevent an antitrust defendant from being subjected to a myriad of treble–damage suits by all those in any way affected by an antitrust violation. *Hawaii v. Standard Oil Co., supra.*[12]

■ The determination of standing is a preliminary one, to be answered only from an examination of the allegations of the complaint. *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1168 (5th Cir. 1979), *other claims addressed,* 607 F.2d 167 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 280, 65 L.Ed.2d —— (1980); *Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1359 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Pan–Islamic, as indicated in both the original complaint and in the amended complaint, has no connection with the oil business other than its single contract with Sonatrach and its attempt to resell the Algerian crude. There is no allegation that Pan–Islamic intended to remain and establish itself in the oil brokerage business after completion of the Sonatrach contract. Pan–Islamic does not allege that it is a competitor in any of the five areas of the oil industry for which it alleges antitrust violations, or that it intends to enter these areas. The only injury claimed is its inability to sell the oil it purchased in the Sonatrach contract.

Pan–Islamic's allegations of antitrust violations in the areas of exploration, production and transportation of crude oil fail to establish standing, because there is no allegation that Pan–Islamic has entered or has attempted to enter these phases of the oil business. Nor has Pan–Islamic alleged that it has had to pay monopolistic prices for crude oil or for transportation thereof, or that it was unable to purchase transportation for its crude oil.

■ Pan–Islamic's allegation of antitrust violations in the phase of refining presents a closer question. Certainly monopoly power or a conspiracy in restraint of trade at the refining level might give the defendant oil companies monopsony or oligopsony

---

**12.** Cases in which standing has been found lacking are myriad and involve diverse types of plaintiffs:

*Billy Baxter, Inc. v. Coca–Cola Co.,* 431 F.2d 183 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) (franchisor has no standing to sue alleging antitrust violations reducing sales of franchisee and thereby reducing profits of franchisor); *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (10th Cir.), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) (employee has no standing to allege illegal merger resulting in loss of job); *Jeffrey v. Southwestern Bell, supra,* (telephone subscribers have no standing to complain of alleged attempt to monopolize telephone equipment market by phone company by below cost pricing, resulting in higher phone rates to subsidize loss); *Southern Concrete Co. v. United States Steel Corp.,* 535 F.2d 313 (5th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977) (manufacturer of ready–mix concrete has no standing to complain of alleged tying arrangement between seller of cement and a competitor in ready-mix concrete); *Donovan Construction Co. of Minnesota v. Florida Telephone Corp.,* 564 F.2d 1191 (5th Cir. 1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1878, 56 L.Ed.2d 389 (1978) (electrical construction contractor has no standing to allege antitrust violation when defendant in phone interconnect business terminated contract when plaintiff entered interconnect business in another area); *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148 (5th Cir. 1979), *other claims addressed,* 607 F.2d 167 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 280, 65 L.Ed.2d —— (1980) (cattle farmers and ranchers have no standing to allege retail price fixing by grocers, resulting in reduced consumer demand for beef).

Cases where standing has been expressly found include:

*Dailey v. Quality School Plan, Inc.,* 380 F.2d 484 (5th Cir. 1967) (employee whose position was terminated has standing to allege termination due to illegal acquisition of employer by defendant), *cf. Reibert v. Atlantic Richfield Co., supra; Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172 (5th Cir. 1976) (union and tugboat employees have standing to allege that tugboat company and competitor union conspiring to provide cheaper labor); *Midland Telecasting Co. v. Midessa Television Co.,* 617 F.2d 1141 (5th Cir. 1980) (UHF station has standing to sue cable television and its co–owners alleging conspiracy to refuse to carry UHF's station's signal on cable).

power [13] to dictate prices at which sellers of crude oil would be able to sell their product, or might facilitate an agreement not to purchase Pan–Islamic's oil. In both situations, Pan–Islamic would arguably be within the "target area." Nevertheless, even assuming *arguendo* Pan–Islamic's standing to sue with respect to these allegations, the trial court did not abuse its discretion in dismissing the amended complaint. These allegations of monopolization, attempts to monopolize, and conspiracy at the refining levels are repetitious of allegations made in the original complaint. As such, Pan–Islamic suffered no prejudice by the district court's refusal to grant leave to amend with respect to these claims.

■ With respect to Pan–Islamic's allegations of antitrust violations in the transportation of refined products or in the marketing of refined products, Pan–Islamic has failed to establish that it is within the "target area" of these violations since it fails to allege it was a purchaser (or had any other nexus to) of transportation for refined products or was a purchaser of the refined products themselves. These are the same failures we found in *In re Beef Industry*, where we held that cattle farmers and ranchers had no standing to sue on a theory of retail price fixing by grocers, since the farmers and ranchers failed to allege they had purchased any beef at retail. 600 F.2d at 1168. Indeed, Pan–Islamic's case is weaker than that in *In re Beef Industry* since Pan–Islamic does not make even rudimentary allegations, present in *In re Beef Industry*, that antitrust violations in the retail phase of the industry resulted in reduced demand for its product.[14]

Having found Pan–Islamic to have no standing with respect to four of the five antitrust violations it alleged in its amended complaint, and no prejudice resulting from the refusal to allow amendment of its complaint with respect to the fifth, we refuse to find the trial court abused its discretion in refusing Pan–Islamic leave to amend its complaint.

III. Extent of Discovery

Pan–Islamic complains that the trial court improperly limited discovery, wrongfully restricting discovery both in time and in scope. Clearly, if Pan–Islamic did not have an adequate opportunity to discover facts to oppose the motion for summary judgment, granting summary judgment would be improper. *First–National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix, Corp.*, 554 F.2d 551 (2nd Cir. 1977); *Parrish v. Board of Commissioners of Alabama State Bar*, 533 F.2d 942 (5th Cir. 1976); *see also Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (dismissals in antitrust cases prior to giving plaintiff ample opportunity for discovery to be used sparingly). After a careful review of the record, we are convinced that Pan–Islamic had ample opportunity to engage in discovery on all issues encompassed by its original complaint and to bring appropriate motions to compel answers and the production of documents.

Pan–Islamic filed its original complaint on April 3, 1974. After the defendants filed their answers to the original complaint, several of the defendants immediately began their discovery process. Pan–Islamic, though, did not begin its discovery at

---

13. We use the term "monopsony" to refer to a monopoly of a single purchaser, and the term "oligopsony" to refer to an oligopoly resulting from a group of purchasers.

14. Pan–Islamic's amended complaint in no way suggests that it is relying on a passing-on theory with respect to the alleged antitrust violations in the marketing of refined petroleum products. A passing-on theory in this context would be that the depressed prices dictated by the distributors of refined products and imposed upon refiners are in turn passed on by refiners to sellers of crude. *See In re Beef Industry*, 600 F.2d at 1153, n.2. Pan–Islamic makes no allegation that its inability to sell its crude oil in any way resulted from depressed prices which purchasers of refined oil products conspired to exact from the refiners. Nor does Pan–Islamic make any factual allegation supporting such a theory. Accordingly, this theory is unavailable to preserve the amended complaint.

this time. Instead, it informed the trial court and defendants at a pre–trial conference held on October 31, 1974, of its intention to file the amended complaint, broadening the grounds for its requested relief. Pan–Islamic also made known its intention to request that discovery be handled pursuant to procedures established by the Manual for Complex Litigation. The trial court indicated that it would defer ruling on Pan–Islamic's motion concerning discovery under the Manual for Complex Litigation until it had ruled on Pan–Islamic's Motion to Amend.

On January 6, 1975, Pan–Islamic filed its Motion for Leave to Amend its Complaint and a motion that the case be handled pursuant to the Manual for Complex Litigation. Thereafter, Pan–Islamic did not initiate any discovery until it filed its First Set of Interrogatories to the defendants on June 11, 1975, fourteen months after the complaint was filed. At this time the trial court had not ruled on Pan–Islamic's motion to amend its complaint. These interrogatories consisted largely of very general, broad questions designed to ascertain what records were available and the identities of responsible officials. They were extensive, consisting of 120 questions, and were wide ranging, encompassing issues within both the original and amended complaint. All the defendants filed answers and objections to Pan–Islamic's interrogatories by October 8, 1975. The responses to these interrogatories among the defendants, not surprisingly, varied extensively. Many of the defendants identified relevant records and documents and indicated a willingness for Pan–Islamic to inspect and copy these documents. Some of the defendants objected on various grounds to questions arguably relevant to the issues of the original complaint. All of the defendants objected to the bulk of the questions on the grounds that such questions were relevant only with respect to the proposed amended complaint, on which the trial court had not yet ruled. Despite the paucity of answers to its interrogatories, Pan–Islamic did not move for a motion to compel answers to interrogatories pursuant to Fed.R.Civ.P. 37(a). Nor did it attempt any further discovery in the form of depositions, additional interrogatories, requests for production of documents, or follow–ups on those offers permitting Pan–Islamic to inspect and copy records.

Matters on both sides thereafter lay dormant until March 26, 1976, when the trial court scheduled a pre–trial conference for June 10, 1976, in order to determine whether to grant leave to amend, whether to handle the cases under the provisions of the Manual for Complex Litigation, and to establish a schedule for orderly and efficient discovery. At this pre–trial conference, the trial court denied Pan–Islamic's Motion for Leave to Amend Complaint, but agreed to give the necessary representations under 28 U.S.C.A. § 1292(b) for Pan–Islamic to bring an interlocutory appeal. The trial court asked Pan–Islamic how much additional time it would need for discovery with respect to the original complaint. Pan–Islamic informed the court that six months would suffice. Relying upon this representation, the trial court ordered Pan–Islamic to complete its discovery by December 10, 1976.

Pan–Islamic did not immediately resume its discovery after the June 10 pre–trial conference. Instead, it devoted itself primarily to pursuing the interlocutory appeal of the trial court's refusal to grant leave to amend, which appeal this court refused to hear. Pan–Islamic also addressed several motions by various defendants for dismissal by reason of Pan–Islamic's failure to comply with court orders. It was not until October 13, 1976, four months into the six–month period the trial court gave Pan–Islamic for discovery, that Pan–Islamic wrote the defendants requesting depositions of specific officials. The record indicates that the defendants were cooperative and expressed a willingness to arrange the depositions. Yet, on December 10, 1976, the end of the six–month period specified for discovery, Pan–Islamic had taken depositions of officials of only Exxon, Tenneco and Shell. Pan–Islamic had submitted no additional interrogatories during this six–month

discovery period. Nor had Pan–Islamic indicated it wished to inspect or copy records of those defendants expressing a willingness in the original interrogatories for such inspection.

Toward the expiration of the six–month period, on November 29, 1976, Pan–Islamic filed a Motion for Extension of Time to Complete Discovery. It grounded this request on the time necessary to bring the interlocutory appeal and to address the various motions of the defendants. Pan–Islamic did not make any motion to compel any discovery at that time or at any time before the December 10 deadline. The trial court denied Pan–Islamic's request in an order filed December 17, 1976.

On January 3, 1977, Pan–Islamic then filed a motion for the trial court to reconsider its denial of an extension of time in which to complete discovery. This motion essentially repeated the story told above and raised the same grounds for an extension as in the prior motion. Among other things, the motion made references to several motions mistakenly believed to have been filed by Pan–Islamic to compel answers to its interrogatories.[15] The trial court, noting that it was exercising an abundance of caution, granted Pan–Islamic three additional months from the date of the court's order, February 14, 1977, to continue discovery, but expressly limited the discovery to the depositions noticed by Pan–Islamic in its letter of October 13, 1976. The trial court, noting that Pan–Islamic had mistakenly assumed that motions to compel answers had been filed, nevertheless ruled that those interrogatories objected to by the defendants pertained to the amended complaint and were beyond the scope of Pan–Islamic's original complaint.

Despite the limitation placed upon this extended discovery, on March 2, 1977, Pan–Islamic filed a motion for inspection and production and copying of special documents in the possession of Exxon, the existence of which Pan–Islamic learned during its depositions of Exxon officials in the earlier six–month discovery period. This motion was denied by the trial court on grounds that its order of February 14, 1977, had expressly limited discovery to the depositions for which notice had been given on October 13, 1976.

Pan–Islamic thereupon completed its depositions of officials of the defendants, and in addition submitted affidavits in opposition to the defendants' motion for summary judgment.

■ We test Pan–Islamic's contention of improperly curtailed discovery against the familiar standard that the trial court has wide discretion in determining the scope and effect of discovery. *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979); *Washington v. Norton Manufacturing, Inc.*, 588 F.2d 441 (5th Cir.), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2886, 61 L.Ed.2d 313 (1979); *Aviation Specialities, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir. 1978).

■ Pan–Islamic first complains that the trial court's dilatoriness in ruling on its motion to amend the complaint, despite alleged repeated requests for such a ruling,[16] precluded it from initiating meaningful discovery. Pan–Islamic maintains that until it knew whether the complaint could be amended, it could not properly pursue dis-

**15.** The request for the court to reconsider the denial of an extension of time clearly does not make any actual motion to compel answers, but merely indicates that Pan–Islamic thought motions to compel answers to interrogatories had already been filed and had been left unresolved by the court. A thorough review of the record shows that at no stage of the proceedings had Pan–Islamic filed motions to compel answers to its interrogatories. There is nothing in the record to indicate which interrogato-

ries Pan–Islamic desired to be answered or why it believed itself entitled to such answers.

In a post–hearing letter–brief to this panel, Pan–Islamić concedes that no formal motion to compel answers was ever filed, and explains the mistaken reference to such motions to compel as resulting from a change of attorneys.

**16.** We find in the record only one such request, contained in Pan–Islamic's June 11, 1975, Motion to Reset the Pre–Trial Conference, asking

covery.[17] This argument is without merit for two reasons. First, Pan–Islamic does not explain why it could not have pursued discovery with respect to the matters raised in its original complaint until the trial court had granted or denied leave to amend. Second, and more importantly, this argument fails because at the conference on June 10, 1976, when the court denied leave to amend the complaint, Pan–Islamic was asked how much time it would need to complete discovery on its original complaint. It was on the basis of Pan–Islamic's own representation that the trial court at that time allowed six additional months discovery. Pan–Islamic cannot now be heard to complain of any alleged dilatoriness by the trial court when the court later gave it the time it requested to complete discovery.

Although Pan–Islamic acknowledges, as it must, that it represented to the court that six additional months of discovery would suffice, it argues now that it should not be held to its representation at the June 10 conference. It argues that when it requested six months, it assumed the trial court would defer ruling on the amended complaint. Since the trial court denied leave to file the amended complaint, but granted an interlocutory appeal, much of the six months, Pan–Islamic states, was consumed with pursuing the interlocutory appeal–a task it had not included in the estimate of six months for discovery. A reading of the transcript of the June 10 conference indicates, however, that after the court made clear that it was denying Pan–Islamic's motion to amend the complaint and would make the necessary representations to bring an interlocutory appeal, Pan–Islamic had ample opportunity to revise its estimate of time needed to complete

discovery in light of its prosecution of an interlocutory appeal. However, it made no such revision.

Pan–Islamic maintains that the trial court abused its discretion in refusing to grant unlimited discovery in its order of February 14, 1977, extending discovery three months. We fail to perceive any abuse when Pan–Islamic had failed to efficiently utilize the two and one–half year period from its complaint to the June 10, 1976, conference or the interrogatories it filed during this period, and when Pan–Islamic failed to utilize the first four months of the six months it had requested for discovery. *Cf. Aviation Specialities, Inc. v. United Technologies Corp., supra* (where this court found adequate discovery in antitrust litigation when the trial court unilaterally imposed time limits on discovery and the appellant failed to act promptly to initiate discovery).

More specifically, Pan–Islamic argues that the trial court abused its discretion in interpreting its February 14 order to preclude Pan–Islamic's March 2 motion to produce certain Exxon documents, documents which Pan–Islamic had discovered during deposition of Exxon officials. A fair reading of the order indicates that the trial court did limit the three–month extension only to the completion of depositions and not to the filing of motions to compel production of documents or answers to interrogatories.[18] The language indicates that the three–month extension was limited to depositions noticed and discovery initiated before December 10. Pan–Islamic did not formally file its motion to compel production until well after the December 10 cutoff. When it requested the three–month extension in its January 3, 1977, motion to

---

the court to make a ruling on the amended complaint.

17. Pan–Islamic's argument appears premised on its belief that it could not meaningfully pursue discovery until the trial court had ruled on its motion to conduct discovery under the procedure for complex litigation, for which ruling on the motion to amend the complaint was crucial.

18. The relevant language of the order reads:
Plaintiff may continue discovery for three (3) *months from the date of this Memorandum* and Order *but this discovery is limited to* these depositions which Plaintiff noticed by letter of October 13, 1976, to Defendants, *i. e., only discovery which Plaintiff had initiated prior to the December, 1976, cut–off date originally established by the Court.*
(emphasis in original).

reconsider the denial to extend discovery, Pan–Islamic had attached as an exhibit a motion to produce the Exxon documents, which it indicated it would file if discovery were extended. Pan–Islamic clearly indicated it was not filing the motion with its request for an extension of discovery, and made no argument to the trial court that it had a right to compel production of the documents. The fact that the trial court expressly limited the three–month extension to depositions noticed, read against the context of the motion attached as an exhibit, indicates that the court was limiting discovery to completion of depositions already noticed and would allow nothing else. Nor can Pan–Islamic argue that the trial court's February 14 order was an abuse of discretion for refusing Pan–Islamic the right to file its motion to produce. When Pan–Islamic made its request on January 3 for reconsideration of denial of extension of discovery, it merely attached the proposed motion as an exhibit and clearly stated it was not filing or pursuing the motion at that time. Pan–Islamic did not argue, either then or when it subsequently filed the motion on March 2, 1977, that it had a right to produce these Exxon documents under the rules of discovery or pursuant to the trial court's June 10 order. Accordingly, we find no reversible error with respect to the trial court's denial of Pan–Islamic's motion to produce the Exxon documents.[19]

Finally, Pan–Islamic argues that the trial court erred in failing to compel any answers to Pan–Islamic's interrogatories. The defendant oil companies counter by arguing that Pan–Islamic made no motions to compel and is raising this issue for the first time on appeal. Pan–Islamic maintains that although it may have failed to file any formal motions to compel answers, its motion to reconsider the trial court's initial refusal to extend discovery made it clear that it believed such motions

had been filed and was tantamount to actually filing such a motion. The resolution of this issue is muddied somewhat by the trial court's ruling, despite its belief that no motions had been filed, that those interrogatories not answered pertained only to the amended complaint and could not be compelled. We begin our resolution of this issue by noting that the Federal Rules of Civil Procedure provide that if a party objects to or fails to answer interrogatories, the party submitting the interrogatories may move the court for an order under Fed.R.Civ.P. 37(a) compelling an answer. Fed.R.Civ.P. 33(a). An objection to an interrogatory is not passed on by a court unless a motion to compel under Rule 37(a) is made. Fed.R.Civ.P. 33(a); 8 Wright and Miller, *Federal Practice & Procedure, Civil,* § 2173 (1970). We refuse to hold in the circumstances of this case that Pan–Islamic's statement to the trial court indicating a belief that a motion had been made was the same thing as making such a motion.[20] Its statement did not alert its opponents to the need to oppose a pending motion. The statement made by Pan–Islamic was unaccompanied by a supporting brief or any specification of precisely what was sought to be compelled and why such compulsion was justified. Neither the defendants nor the trial court knew why Pan–Islamic believed itself entitled to certain answers. Neither had an opportunity to make a fully informed and rational decision, respectively, of whether or not to answer or to compel answers to the interrogatories Pan–Islamic wanted. Accordingly, we conclude that Pan–Islamic made no proper motion to compel below and thus did not properly present the issue before the trial court and, accordingly, its contention must fail.

The fact that the trial court ruled that it would not compel answers despite its belief that no motion to compel had been filed does not change our reasoning. This

**19.** We note also that Pan–Islamic has made no demonstration of harm resulting from this denial. *See United States v. Garrett,* 571 F.2d 1323, 1326 (5th Cir. 1976); *Bell v. Swift & Co.,* 283 F.2d 407 (5th Cir. 1960).

**20.** We do not imply a return to the technicalities of making motions found in common law and do not require adherence to a strict procedure as a prerequisite to an effective motion.

ruling does not effectively preserve the matter on appeal. There is a familiar rule that an appellate court will ordinarily not consider a legal issue or theory that was not presented to the trial court. "[J]udicial economy is served and prejudice is avoided by binding the parties to the facts presented and the theories argued below." *Bliss v. Equitable Life Assurance Society of U.S.*, 620 F.2d 65, 70 (5th Cir. 1980), *quoting Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768, n.10 (5th Cir. 1976). This rule does not apply if a manifest injustice would result from ignoring the new legal theory. *Higginbotham v. Ford Motor Co., supra.* Because Pan–Islamic's failure to obtain the requested answers does not result in a manifest injustice, the rule precludes it from raising these issues for the first time on appeal.

In summary, we conclude that the trial court did not abuse its discretion in limiting discovery. Pan–Islamic filed its first and only interrogatories on June 11, 1975, fourteen months after the complaint was filed. It never made a motion to compel with respect to the questions objected to by defendants. It never pursued the offers of several defendants to permit inspection and copying of records. At the pretrial conference on June 10, 1976, two years and two months after suit was filed, Pan–Islamic was granted six additional months for discovery, which was the length of time Pan–Islamic requested. Pan–Islamic pursued no further discovery until October 13, 1976,

four months into the allotted six months. Although at first refusing another extension, the trial court did reconsider and permit three additional months of discovery, limited however to those depositions which had already been noticed. In light of Pan–Islamic's own lack of diligence in pursuing discovery, in light of Pan–Islamic's representation that the additional six month period would suffice, in light of the fact that the total time allowed for discovery was three years and one month, and under all the other circumstances here, we find no abuse of discretion.

## IV. Appropriateness of Summary Judgment

Pan–Islamic relies heavily on *Poller v. CBS*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), to argue that summary judgment may not be granted in a complicated antitrust case. The Supreme Court held in *Poller* that where there is substantial factual evidence tending to show the existence of a conspiracy to eliminate a competitor and where the crucial question is motive, summary judgment should be used sparingly.[21] *Poller*, though, has not eliminated summary judgment from antitrust litigation. Many cases in this and other circuits have upheld summary judgment for defendants in antitrust suits.[22]

The holding in *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct.

**21.** In *Poller*, the Supreme Court stated,

We believe that summary procedure should be used sparingly in complex anti–trust litigation where motive and intent play leading roles. The proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross–examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of even handed justice.

368 U.S. at 473, 82 S.Ct. at 491.

**22.** Such cases from the Fifth Circuit include: *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir. 1979); *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111 (5th Cir. 1979); *American Telephone & Telegraph Co. v. Delta Communi-

cations Corp.*, 408 F.Supp. 1075 (S.D.Miss. 1976), *aff'd* 579 F.2d 972, *modified in part*, 590 F.2d 100 (5th Cir. 1978); *Aviation Specialities, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir. 1978); *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389 (5th Cir. 1976); *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

Cases from other circuits include: *Natrona Service, Inc. v. Continental Oil Co.*, 598 F.2d 1294 (10th Cir. 1979); *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451 (9th Cir. 1979); *Lamb's Patio Theatre v. Universal Film Exchanges, Inc.*, 582 F.2d 1068 (7th Cir. 1978).

*See also* Rogers, *Summary Judgment in Antitrust Conspiracy Litigation*, 10 Loyola U. of Chicago L.J. 667 (1979).

1575, 20 L.Ed.2d 569 (1968), has a significance equal to the cautionary language of *Poller.* *Cities Service* is very similar to the instant case. There the plaintiff unsuccessfully attempted to sell Iranian oil to several major oil companies. He alleged that his attempts were frustrated by a worldwide conspiracy to boycott Iranian oil in response to Iran's nationalization of certain assets. The question before the Supreme Court was whether summary judgment had been properly granted with respect to one defendant, Cities Service Company. In answering this question, the Supreme Court took the allegation of conspiracy among the other defendants to boycott Iranian oil to be both true and legally sufficient. 391 U.S. at 274, n.13, 88 S.Ct. at 1585, n.13. The facts the plaintiff produced to demonstrate participation by Cities Service in the conspiracy were the abrupt decision by Cities Service not to purchase the Iranian oil despite extensive negotiations with the plaintiff and the attractiveness of the plaintiff's offer. The Court noted that these facts standing alone might well be sufficient to require the case to be presented to a jury to determine the motives of Cities Service for not dealing with the plaintiff. But, significantly, the Court upheld summary judgment, noting that there was such an overwhelming amount of contrary evidence as to Cities Service's motives that summary judgment was proper. Among the factors supporting summary judgment were (1) that Cities Service had been engaged in negotiations to purchase Kuwait oil which it bought instead of the Iranian oil long before the offer by the plaintiff of Iranian oil was made, and (2) the obvious lack of common interests of Cities Service with the other alleged conspirators.

In upholding summary judgment for Cities Service, the Court made two noteworthy statements concerning summary judgment in antitrust suits. The Court stated:

> [N]ot only is the inference that Cities' failure to deal was the product of factors other than conspiracy at least equal to the inference that it was due to conspiracy, thus negating the probative force of

the evidence showing such a failure, but the former inference is more probable. 391 U.S. at 280, 88 S.Ct. at 1588. In significant language qualifying the *Poller* caution against use of summary judgment in antitrust litigation, the Court stated:

> Essentially all that the lower courts held in this case was that Rule 56(e) placed upon Waldron [the plaintiff] the burden of producing evidence of the conspiracy he alleged only after respondent Cities Service conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them. That holding was correct. To the extent that petitioner's burden–of–proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigant's rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full dress trial not withstanding the absence of any significant probative evidence tending to support the complaint.

*Ibid.* at 291, 88 S.Ct. at 1593.

 It is clear that this circuit has heeded the language in *Cities Service.* When faced with defendants' sworn denial of the existence of a conspiracy, it is incumbent upon the plaintiff to produce significant probative evidence demonstrating that a genuine issue of fact exists as to this element of the complaint. *Aviation Specialties, Inc. v. United Technologies Corp.,* 568 F.2d 1186 (5th Cir. 1978); *Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389 (5th Cir. 1976); *Scranton Construction Co. v. Litton Industries Leasing Corp.,* 494 F.2d

778 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).[23]

██ Each defendant in this case, by affidavit of a responsible official and by answers to interrogatories, denied participation in any conspiracy or agreement to boycott Algerian crude oil. Appropriate officials from each company who were responsible for purchasing oil swore that the decision not to purchase Pan–Islamic's oil was made unilaterally and on the basis that Pan–Islamic's price was noncompetitive.

In light of the evidence offered by the defendant oil companies rebutting Pan–Islamic's conspiracy allegation, Pan–Islamic must produce significant, probative evidence supporting its complaint. Pan–Islamic attempts to rebut the defendants' motion for summary judgment with both direct and circumstantial evidence of a conspiracy. Part of Pan–Islamic's circumstantial evidence relies upon the theory of conscious parallelism. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). We have thoroughly reviewed the evidence Pan–Islamic offers to rebut the defendants' summary judgment motion. This review reveals a total lack of any significant, probative evidence supporting the existence of a conspiracy. We first discuss Pan–Islamic's allegation that there was a French–sponsored boycott of Alergian oil, and then we discuss Pan–Islamic's reliance on the theory of conscious parallelism.

#### A. French–sponsored boycott

Pan–Islamic contends that the French government sponsored a boycott of Algerian oil beginning on February 24, 1971, and lasting through June 30, 1971, with its effects continuing to the end of 1971.[24]

The record is notably devoid of any direct or circumstantial evidence establishing the existence of any boycott of Algerian oil, either of a worldwide scope or by the defendant oil companies. There is no admissible evidence in the record demonstrating the pattern of worldwide sales of Algerian crude before, during or after the alleged boycott. Other than the alleged difficulties of Pan–Islamic, there is no admissible evidence that the Algerians or anyone dealing with Algerian crude had any difficulties in selling oil, nor is there any evidence of unusual price fluctuations of Algerian crude. There is nothing in the record establishing the defendant oil companies' need for Algerian crude or their purchasing habits with respect to Algerian crude before, during or after the alleged boycott. Although Pan–Islamic alleges that the French government together with French oil companies sponsored a boycott, there is no evidence from any French official or French oil company executive that they called for a boycott, nor is there any communication in the record of calls for boycotts directly from the French oil companies themselves.

Many of the factors the Supreme Court noted in dicta in *First National Bank of Arizona v. Cities Service Co., supra*, as supporting the existence of an English–supported boycott of Iranian oil in that case are lacking in this case. There is nothing in the record indicating the direct promulgation throughout the oil industry by the French government or oil companies of a threat to take all actions to protect their rights, including lawsuits, against those dealing in Algerian oil. *Ibid.* 391 U.S. at 278, 88 S.Ct. at 1585.[25] There is no indica-

**23.** *See Solomon v. Houston Corrugated Box Co.*, 526 F.2d at 393–394 for various formulations of the requirement upon plaintiff to counter a well-supported motion for summary judgment by defendants in antitrust litigation.

**24.** Pan–Islamic fails to explain what continuing effects there were after the end of the boycott on June 30, 1971. The record reveals that one of the contacts with Exxon by Pan–Islamic representatives occurred on July 1, 1971. Pan–Islamic has offered no theory explaining why

Exxon's refusal to purchase Pan–Islamic's oil offered on July 1, 1971, can be attributed to a boycott ending on June 30, 1971.

**25.** There were newspaper reports of French efforts to arrange a boycott and reports of French threats to sue any company purchasing the particular Alergian oil claimed by the French. As we note below, these newspaper reports are inadmissible to prove the truth of the existence of the alleged boycott.

tion of communication by the defendant oil companies of their support of the French position and of their intention to refuse to deal with any company dealing with Algerian oil. *Ibid.* There is no admissible evidence indicating that the numerous oil companies contacted by Pan–Islamic stated that their refusal to purchase its oil stemmed from fear of retaliation. *Ibid.* There is no indication of any threats by the defendant oil companies to boycott companies leasing tankers to transport Algerian oil. *Ibid.* Nor has Pan–Islamic established the holdings of the defendant oil companies in foreign countries where nationalization might be a threat. Such a fact, if established, might establish a motive for the oil companies to boycott Algerian oil after its nationalization of French oil. *Ibid.*

Pan–Islamic alleges that two organizations of oil companies, the London Policy Group and the New York Policy Group, were vehicles through which the oil companies established their boycott of Algerian crude. Many of the defendants, however, belong to neither group. Those who are members denied that there was any discussion of Algerian oil or the problems between France and Algeria at any meeting. Pan–Islamic has not attempted to rebut these characterizations of the discussions at the meetings of these two groups.

Pan–Islamic contends that four evidentiary items establish a genuine issue as to the existence of the French boycott: (1) the affidavit of Arnold I. Burns, (2) the affidavit of Tyrus G. Fain, (3) reference by oil company officials to a dispute between France and Algeria, and (4) a statement allegedly made by Roland M. Routhier, an official with Texaco.

■ Mr. Burns' affidavit consists primarily of statements allegedly made by Joseph Buchanan, the president of Petroco, to Mr. Burns or to representatives of Sonatrach in Mr. Burns' presence. Mr. Buchanan allegedly stated that the difficulty Sonatrach was having in selling its oil resulted from a boycott of Algerian crude. Fed.R. Civ.P. 56(e) requires that affidavits in support of or opposition to a summary judgment motion set forth facts that would be admissible in evidence. It is well established that hearsay evidence in such affidavits is entitled to no weight. 6 Moore's Federal Practice ¶ 56.22[1] (2d ed. 1979); *Munoz v. International Alliance of Theatrical Stage Employees, Etc.*, 563 F.2d 205, 213 (5th Cir. 1977); *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657 (5th Cir. 1976). The statements which Burns attributes to Buchanan constitute hearsay under Fed.R.Evid. 801 and are inadmissible under Rules 802–804 to prove the truth of the matters asserted.

One portion of Mr. Burns' affidavit consists of his characterizations of the beliefs of Mr. Buchanan that there was a French–sponsored boycott. The various characterizations are either matters of which Burns is legally incompetent to testify under Fed.R.Evid. 602, or if relayed to him and offered in order to prove the truth of their contents, constitute inadmissible hearsay.

Mr. Fain was employed by Pan–Islamic to search newspaper files and various hearing reports concerning possible antitrust activities of the major oil companies. His affidavit merely states that the attachments to his affidavit are true and correct copies of articles and reference materials. Attached to his affidavit are newspaper articles (some in untranslated French), a lengthy excerpt from a book entitled, *The Control of Oil*, and a copy of a complaint filed in another antitrust action. All of this material is hearsay and is inadmissible to prove the truth of the existence of a boycott. Some of the newspaper reports indicate that French oil companies had threatened to sue companies purchasing the portion of the Algerian oil to which the French laid claim. While these newspaper reports are arguably admissible as public announcements enabling co–conspirators to coordinate their activity and while some oil com-

pany officials were aware of the threat,[26] these reports are nevertheless inadmissible to prove the truth of the existence of a boycott or even that such threats had actually been made.

Several oil company officials in depositions testified that they were aware of a dispute between France and Algeria concerning title and right to some of the Algerian crude oil and a threat by French oil companies to sue purchasers of the Algerian oil which they claimed.[27] None of these statements admitted the existence of a French–sponsored boycott. Nor did these statements in any way indicate that the French had solicited aid from any oil companies in connection with the French–Algerian dispute. There is no indication as to how these executives learned of this dispute and threat to sue, and there is no indication that the French government communicated in any way with these oil companies. There was nothing in these statements to suggest the oil companies had directly received threats from the French of retaliation should they buy Algerian oil. At most, the statements of the oil company officials reveal an awareness of a dispute between France and Algeria and a concern of possible litigation over legal title to any crude oil purchased from Algeria. Such a concern would be a legitimate factor in determining whether to purchase such oil. The statements in no way suggest that the reason the companies refused to buy Pan–Islamic's oil was fear of retaliation by the French. Indeed, Pan–Islamic states that it had a letter from Sonatrach which it showed to some of the defendant oil companies, indicating that the oil was not subject to the French–Algerian dispute.

Out of more than 3,500 pages of deposition, not to mention numerous affidavits and exhibits, the most significant evidence to which Pan–Islamic can point in support of its allegation of a conspiracy is a state-

ment Icsel attributes to Mr. Roland Routhier, a Texaco official in charge of the Supply and Distribution Department. Icsel, in his deposition, testified that during a meeting with Routhier at which Pan–Islamic offered its oil, Routhier stated, "If any others did buy a drop of oil from you, come over and we will buy the rest." The meeting at which this statement occurred lasted only thirty minutes. Icsel testified that he did not ask Routhier what he meant by this statement and that Routhier in no way amplified upon his remark. Icsel testified that the conversation with Routhier dealt only with generalities and there is no indication that Routhier's statement was anything more than a casual remark. Nor does Icsel's deposition indicate that Routhier's statement could be construed as a genuine offer to buy at Pan–Islamic's price should other companies purchase any of its oil.

Icsel's testimony concerning Routhier's statement is admissible as an admission by a party opponent. Fed.R.Evid. 801(d)(2). Accordingly, we must determine what inferences may be drawn from this statement. In evaluating Icsel's testimony, we are required to indulge in every reasonable inference in favor of Pan–Islamic. The court, however, need only make reasonable inferences. In this court's modification of the opinion in *American Telephone and Telegraph Co.*, we stated:

> Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the *facts established* by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do.

590 F.2d at 102. (emphasis added).

We believe that the ambiguity of Routhier's statement, together with the paucity of

---

**26.** Pan–Islamic did not allege before the trial court nor did it argue to this court, the newspaper announcement of the French companies' threat served as the medium by which the alleged co–conspirators coordinated their efforts. Instead, the newspaper reports were of-

fered to prove the fact of the existence of the French–sponsored boycott.

**27.** Deposition of Arthur Conner, Texaco, p. 23; deposition of Routhier, Texaco, pp. 27–30; deposition of Robert Doyle, Exxon, pp. 31–34.

the established evidence, makes an inference of a conspiracy from Routhier's remark unreasonable. We make this holding in light of all the facts established in the record, including those discussed below with respect to Pan–Islamic's claim of conscious parallelism.[28]

■ Having found the bulk of Pan–Islamic's evidence supporting a French–supported boycott inadmissible, and having found no evidence establishing a motive to join a boycott of Algerian oil, Pan–Islamic in effect asks us to infer a conspiracy on the basis of Routhier's single statement, uncorroborated by other evidence. The statement is ambiguous, perhaps reflecting a willingness by Routhier to reconsider the competitiveness of Pan–Islamic's asking price should another company buy its oil.

While it is undisputed that circumstantial evidence can establish the existence of a conspiracy in antitrust litigation, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), we have found no case where an inference of conspiracy was permitted based on such a slender reed.[29] Such a statement standing alone is inadequate to support an inference of the existence of an agreement. It fails to constitute the "substantial factual evidence tending to show the existence of a conspiracy," as required by *Cities Service*.

## B. Conscious Parallelism

Pan–Islamic alleges that it made an offer which was economically attractive to each of the defendant oil companies, but that each of the defendants rejected this offer. Such parallel conduct, Pan–Islamic argues,

---

**28.** We find below that Pan–Islamic has failed to establish a genuine issue of fact by means of a conscious parallelism theory as to whether the defendant oil companies conspired to boycott Algerian oil. Pan–Islamic failed to show it had effectively contacted eleven of the defendants to make an offer. With respect to the four companies contacted, Pan–Islamic has failed to rebut their evidence that they refused Pan–Islamic's oil because the asking price was not competitive. Thus, Pan–Islamic's reliance on conscious parallelism offers no support to an inference of participation in a conspiracy by the defendant oil companies.

**29.** Representative of the cases in which an inference of a conspiracy has been held reasonable in a summary judgment context are:

*Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969) (In complaint that defendant cemeteries and burial monument manufacturer conspired to deprive plaintiff monument manufacturers of market in defendant cemeteries, evidence included facts that pamphlets circulated by one defendant among other defendants suggested competitive barriers to plaintiff retailers of burial monuments, that defendant cemeteries required burial monuments of specified alloy manufactured by co-defendant, that plaintiffs had presented evidence attacking the reasonableness of the requirement of a specified alloy, that defendant cemeteries attempted to dissuade purchasers from buying plaintiffs' monuments, and defendants' refusal to let plaintiffs install monuments plaintiffs sold); *cf. Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328 (9th Cir. 1973) (similar facts and similar result.)

*Poller v. Columbia Broadcasting System, supra* (In allegation that defendant network con-

spired to drive plaintiff UHF station out of business, evidence included facts that in a short space of time, national network moved affiliation to competing UHF station purchased by individual at instigation of network, drove plaintiff UHF station which had been profitable out of business, and later abandoned second UHF station for VHF station, as well as a steady decline nationwide in UHF stations.)

*Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139 (4th Cir. 1979) (In allegation that automobile manufacturer and franchise dealers conspired to fix repair rates, evidence included facts that manual was distributed by manufacturer among franchisee retailers/repairers suggesting rates for repair, that franchisees had frequently corresponded with manufacturer/promulgator of manual concerning repair times and rates in manual, and statement by a service agent that manual rates were mandatory.)

*DeVoto v. Pacific Fidelity Life Ins. Co.*, 516 F.2d 1 (9th Cir. 1975) (In allegation that mortgage company and seller of mortgage protection insurance conspired to deprive plaintiff seller of mortgage protection insurance of names of mortgagors, evidence included fact that plaintiff offered defendant mortgage company better package for names of mortgagors and that defendant companies were affiliated.)

We note that Pan–Islamic has failed to present facts as convincing in these cases indicating a conspiracy among the defendant oil companies. Pan–Islamic does not refer to, and we have not found, a case where an inference of a conspiracy was held to be reasonable solely on the basis of a statement as ambiguous as Routhier's.

is sufficient circumstantial evidence to withstand a summary judgment motion.

We note that two elements must be established by a plaintiff relying on a theory of conscious parallelism: (1) that the defendants engaged in consciously parallel action, (2) which was contrary to their economic self–interest so as not to amount to a good faith business judgment. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., supra* ; *Aviation Specialities, Inc. v. United Technologies Corp.*, 568 F.2d at 1192. We find that Pan–Islamic has failed to establish a factual issue that eleven of the defendants engaged in consciously parallel conduct. With respect to the remaining four defendants, we find that Pan–Islamic has failed to establish a factual issue that their refusal to purchase was contrary to their economic self–interest.

(i) Parallel conduct.

Eleven of the defendants[30] denied by means of affidavits of responsible officials in the appropriate department in charge of purchasing that Pan–Islamic had ever contacted an official with authority to purchase crude oil.[31]

Pan–Islamic never contacted any of these eleven defendants in writing, nor did it keep a formal list of companies contacted. It is clear that there is no competent, admissible evidence that eight[32] of these eleven defendants were in any way contacted by Pan–Islamic. The bulk of the evidence offered by Pan–Islamic to demonstrate its contacts with these defendants consists of statements by various Pan–Islamic principals that each one thought, believed, or had been told, that someone else had approached one of the eight defendants. Pan–Islamic can point to no part of the record in which a representative of Pan–Islamic states that he has personal knowledge that any one of these eight defendants was ever contacted. Typical of the state of the record was Icsel's testimony that he thought Ragan was contacting all the oil companies, which is contradicted by Ragan's testimony that he contacted only Exxon. Such evidence is either incompetent or hearsay and cannot establish a factual issue concerning contacts.

Pan–Islamic relies heavily on a memorandum prepared by Ragan to establish that all of the aforementioned eleven defendants were in fact contacted. The memorandum lists each of the sixteen defendant oil companies and identifies these defendants as firms to whom the availability of Pan–Islamic's crude allegedly had been made known. Beside each firm is a description of each oil company's initial reaction, generally optimistic, to Pan–Islamic's alleged offer. In his deposition, Ragan testified that he had personally contacted only Exxon and that the memorandum was prepared from information given him by George Foulkes, a principal in Pan–Islamic,[33] and other principals in Pan–Islamic. He could not remember who had given him any particular item of information, nor did he have personal knowledge of any contacts by Pan–Islamic with any of the defendants other than Exxon. The memorandum was written for the

---

**30.** Amerada Hess, Amoco, Atlantic Richfield, Continental, Getty, Gulf, Mobil, Occidental, Phillips, Standard (Indiana), and Tenneco.

**31.** Pan–Islamic argues that *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), establishes that it need not prove it contacted each of the defendants to maintain its conscious parallelism allegation. We do not so read *Bogosian.* There the Third Circuit held that a complaint alleging oil companies engaged in interdependent parallel conduct by tying their products to leases of stations stated a cause of action even though the plaintiff had business dealings with only one of the defendants. There was, however, sufficient allegation

of genuine parallel conduct, *i. e.*, each defendant tying its products with leases of stations. Accordingly, nothing in *Bogosian* can be construed as obviating in a conscious parallelism action the need to show parallel conduct among each defendant to be held liable.

**32.** Amoco, Atlantic Richfield, Continental, Gulf, Mobil, Occidental, Phillips, and Standard (Indiana).

**33.** There is no competent evidence in the record concerning the activities of George Foulkes as he died on November 15, 1972, before this suit was filed.

express purpose of proving to Sonatrach Pan–Islamic's efforts to sell the oil after Sonatrach had expressed concern over Pan–Islamic's inability to lift any of the crude. Ragan admits that with this purpose in mind, the memorandum was drafted in the best light possible.

■ Pan–Islamic argues that the Ragan memorandum is admissible as a record of regularly conducted activity under Fed.R. Evid. 803(6).[34] Without considering whether the Ragan memorandum complies with all the requirements for admissibility under Rule 803(6), we find the Ragan memorandum inadmissible because the circumstances of its preparation indicate a lack of trustworthiness. It was drafted not as part of a regular routine by Pan–Islamic to reflect the true state of its marketing efforts, but was drafted for the express purpose of preventing Sonatrach from cancelling the contract. As such, it was written in the most optimistic light Ragan thought the facts would warrant. As such, the memorandum appears to have glaring inaccuracies. For example, despite Ragan's testimony that the memorandum was prepared from information given him by Pan–Islamic's principals, none of those principals professed personal knowledge of any contacts by Pan–Islamic with at least eight of these defendants.[35]

With respect to three defendants, Tenneco, Getty and Amerada Hess, there was contact with an employee of each of these companies, but the contact was insufficient to establish that their not buying Pan–Islamic's oil constituted parallel conduct, because there is insufficient evidence that a responsible official received an offer.

Mr. Romano, an investor in Pan–Islamic who was not engaged in the attempts to sell the oil, testified in his deposition that during the time in question, the president of Tenneco was his neighbor–a coincidence which understandably caused some concern to Tenneco's counsel. In a conversation with the president of Tenneco, literally held in a back yard, Romano mentioned Pan–Islamic's oil to Tenneco's president. Romano testified he did not have enough information to talk knowledgeably about the oil and he did not "push it." Nothing in his deposition indicates that he told Tenneco's president Pan–Islamic's asking price or said anything which could be construed as an offer. While the president of Tenneco is clearly a responsible company official, the fact remains that without evidence of an offer being made, Pan–Islamic has failed to prove Tenneco ever rejected its oil or acted in a manner parallel to those defendants which did receive an offer.

With respect to Getty, the only evidence of a contact is Musslewhite's deposition testimony that in a casual conversation with a friend who at the time was in–house attorney with Getty specializing in labor law, Musslewhite informed him of Pan–Islamic's oil. Musslewhite's deposition fails to indicate whether he made an offer to the attorney or what information was conveyed. Significantly, Musslewhite did not remem-

---

**34.** Fed.R.Evid. 803(6) reads:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**35.** As another example, the memorandum was drafted on June 10. It states that Pan–Islamic's offer to Exxon,

Is at vice president's level, are looking over their various refinery's requirements; expressed some concern over political implications–reverting.

Ragan stated he wrote this on the basis of Foulkes' having contacted someone at Exxon who expressed some interest in Pan–Islamic's oil and requesting Pan–Islamic to follow up. It was not until June 22 that Ragan followed up on this lead and made Pan–Islamic's first firm offer at $3.15 per barrel f. o. b. Algeria.

ber what price he may have quoted to the attorney. Musslewhite asked the attorney to see if Getty "might be interested" in the oil. The attorney later told Musslewhite that Getty was not interested, but there is no indication as to whom the attorney contacted within Getty or what information the attorney may have conveyed to Getty officials.

With respect to Amerada Hess, Clark and Goodwin (vice president and secretary–treasurer, respectively, of Pan–Islamic) stated in their depositions that they had contacted a company official at Amerada Hess's terminal at the Houston ship channel. They could not recollect the name of the official nor did they testify concerning his position. Clark did not describe the meeting, and Goodwin could not remember anything that was said at the meeting, indicating only in the most general of terms that it was part of his effort to sell the oil. Goodwin could not recall whether a price was quoted and could not remember whether the individual contacted expressed an interest or not. Goodwin testified that he thought Ragan was contacting another official with Amerada Hess.

Musslewhite's, Clark's and Goodwin's depositions fail to establish that either Getty or Amerada Hess engaged in the alleged parallel conduct of refusing to purchase oil from Pan–Islamic because there is no factual basis to conclude that an official with the necessary authority was aware of, and rejected, an offer by Pan–Islamic. It is hornbook law that before an employee may bind a corporation, that employee must have actual, implied, or apparent authority. While there is no question in this case of binding these corporate defendants to a legal obligation, it is appropriate to require that, before the acts of their employees in rejecting Pan–Islamic's offer subject them to the possibility of antitrust treble damages,

those acts be authorized by the corporation. This is particularly so with corporate defendants of this large size. Despite Getty's and Amerada Hess's sworn denial that appropriate officials in charge of purchasing were approached by Pan–Islamic, Pan–Islamic has failed to produce any evidence to the contrary. Accordingly, there is no factual issue as to whether Getty and Amerada Hess acted in a parallel fashion with those defendants clearly contacted.[36]

(ii) Economic interests of oil companies contacted.

Exxon, Shell, Texaco and Sun each admit receiving an offer from Pan–Islamic sometime in June or early July, which was refused, allegedly because of Pan–Islamic's noncompetitive price. As this is clearly parallel conduct, our inquiry turns to whether the refusal to purchase was contrary to these defendants' economic self–interest so as not to amount to a good faith business judgment.

Pan–Islamic and the oil companies agree that in the brokerage of crude oil, there is no set market–wide price. Price fluctuates rapidly, being affected by factors as diverse as the needs of various oil companies for certain types of oil, refining capacities and characteristics of companies and climatic weather patterns. It is agreed that each transaction involving the sale and purchase of crude oil is unique and stands on its own feet.

Each of the contacted defendants placed in the record affidavits of appropriate officials with purchasing responsibilities swearing that the decision not to purchase Pan–Islamic's oil was made unilaterally and was based upon the noncompetitiveness of Pan–Islamic's asking price. These companies indicated that they determined current market price largely on the basis of offers which their purchasing departments re-

---

**36.** In sustaining the summary judgment for Tenneco, Getty and Amerada Hess for failure to establish parallel conduct, we do not mean to preclude the possibility that summary judgment could be supported on the second prong of the conscious parallelism theory, i. e., that Pan–Islamic has failed to prove these three

defendants acted contrary to their economic self–interest. There is no indication as to what price Pan–Islamic may have quoted to these defendants. Without such evidence, it is difficult to perceive how a factual issue exists that these companies acted against their economic self–interest.

ceived and subsequent negotiations, or on purchases by subsidiaries. Each company submitted an affidavit containing the market price of oil of comparable quality which was being quoted to the company at that time or which a subsidiary was purchasing.

For the years 1970 and 1971, Exxon produced a high percentage of its crude oil needs, but nevertheless was required to purchase some crude oil. There is no indication as to the amount or grade of oil it purchased during this period. It obtained some of its oil needs from Libya and Indonesia, but the record is silent on other locales from which it was purchasing. Exxon was contacted on June 22 and July 1 by Mr. Ragan, who offered Exxon Pan–Islamic's oil at $3.15 per barrel f. o. b. Algeria. At the July 1 meeting, Ragan states he was told by Exxon officials that they had their own channels for obtaining oil. This is consistent with the affidavits and depositions of Mr. Doyle and Mr. Ellis of Exxon. They indicate that at the time Pan–Islamic made its initial offer to Exxon, Exxon had been engaged for over a month in direct negotiations with Sonatrach, initially discussing approximately 500 million barrels of oil at approximately $2.80 per barrel f. o. b. Algeria. These negotiations eventually resulted in a contract being consummated in October, 1971, between Exxon and Sonatrach for approximately 250 million barrels over a five–year period at $2.75 per barrel f. o. b. Algeria.[37] Ragan testified that he has no reason to believe that Exxon's decision to decline Pan–Islamic's offer was based upon anything other than price and knew of no facts to support the conspiracy allegation.

Texaco's needs for crude oil purchases during 1971 are not established by the record, although Texaco placed in the record the terms of all the contracts it or its sub-

sidiaries had concerning Algerian oil during 1970 and 1971. In late spring or early summer of 1971, Pan–Islamic offered Texaco its Algerian crude at $3.05 per barrel f. o. b. Algeria. The record establishes that this price was well in excess of what Texaco's subsidiaries were paying for comparable grades of crude oil and well in excess of offers available to Texaco from others during that time. From October, 1970, through March, 1971, a Texaco subsidiary was purchasing from an Italian company 10,000 barrels per day of Algerian crude oil at $1.90 per barrel f. o. b. Algeria. In April, 1971, this transaction was renegotiated so that the Texaco subsidiary purchased refined products from the Italian company instead of crude. For the purposes of this renegotiation, the crude oil used by the Italian company was valued at $2.62 per barrel f. o. b. Algeria. On October 1, this contract was again renegotiated whereby the Texaco subsidiary resumed purchasing Algerian crude from the Italian company at a price of $2.62 per barrel f. o. b. Algeria.[38]

On May 26, Musslewhite and Clark visited J. K. Moore, an official with Shell with responsibility for purchasing crude oil. Pan–Islamic offered Shell its oil at $3.15 per barrel f. o. b. Algeria, indicating the price might be negotiable down to $3.05 per barrel. Moore, by affidavit, indicates that when transportation costs from Algeria plus import taxes prevailing at that time were added to Pan–Islamic's price, Shell would be paying a minimum delivered price of over $4.00 per barrel for the Algerian crude at each of its refineries.[39] Moore indicated that during April through May, 1971, Shell was able to purchase its refining and marketing requirements for crude oil from domestic sources at delivered prices at least $.15 per barrel less than the delivered

**37.** There is nothing indicating that this was the same oil which was the subject of Pan–Islamic's contract. The fact that negotiations between Exxon and Sonatrach began at approximately the same time that Pan–Islamic consummated its contract would indicate it is not the same oil.

**38.** In November, 1971, Texaco purchased a quantity of Algerian crude at $2.75 per barrel f.

o. b. Algeria. In September, an official from Sonatrach offered Texaco oil at $2.80 per barrel f. o. b. which Texaco rejected as above market price.

**39.** Shell calculated the delivered cost to its Houston refinery at $4.03 per barrel, to its Illinois refinery at $4.205, and to its Louisiana refinery at $4.015.

price of Pan–Islamic's oil.[40] At the same time, Shell had an offer of crude oil of comparable quality and grade as Pan–Islamic's oil at a delivered price of $3.19 per barrel to its Louisiana refinery.

Sun was contacted by telephone two times in May by Pan–Islamic representatives. In the second call, Pan–Islamic initially quoted a price at $3.15 and then told Sun the minimum price it would accept was $3.12 per barrel f. o. b. Algeria. Sun was told that Pan–Islamic had rejected an offer of $3.00. Sun was beginning to search for a long–term stable supply of low–sulphur foreign crude. Samples of crude oil from three locales had been obtained in order that their refinery characteristics could be determined. An affidavit by a Sun official stated that Sun had a long–standing policy to deal directly with national companies when negotiating a long–term arrangement. , The affidavit indicates that Sun unilaterally rejected Pan–Islamic's offer because Pan–Islamic had furnished no samples of its crude and its offer was substantially above the market price at that time. Sometime after Pan–Islamic contacted Sun, Sun was able to purchase a much smaller amount [41] of Algerian crude at $2.93 per barrel f. o. b. Algeria. In late 1971, Sun entered a contract with Sonatrach for $2.77 per barrel f. o. b. Algeria.

Pan–Islamic has only weak rejoinders to these claims of sound economic reasons for refusing its offer.[42] Pan–Islamic claims that it made clear that its offering price was negotiable. The record does not bear this out with respect to Exxon, to whom Ragan was authorized to quote only a price of $3.15 f. o. b. Algeria. Ragan's deposition indicates that he adhered to this authorization and made no suggestion of negotiability. With respect to Sun, Texaco and Shell, the lowest negotiable price which the record indicates was offered to these companies, as indicated above, was well above the market price as determined by these companies.

Pan–Islamic argues that it informed these companies that should a large oil company agree to purchase its oil, it could renegotiate its contract with Sonatrach to more favorable terms, to the advantage of all concerned. Pan–Islamic alleges that in July or August it was able, despite not having a firm offer, to renegotiate the price with Sonatrach down to $2.84 per barrel f. o. b. Algeria. Even if Pan–Islamic made known to the oil companies the possibility of renegotiating the Sonatrach contract, the oil companies' refusal to contract with Pan–Islamic on such a tentative condition hardly bespeaks the action against economic self–interest to establish a theory of conscious parallelism. Moreover, there is no evidence that Pan–Islamic ever contacted the defendant oil companies to re–offer its oil after the alleged renegotiation of price.

In attempting to show that the defendants' actions were against their economic self–interest, Pan–Islamic places its greatest reliance upon the affidavit of Prof. Helmut Frank, a professor of economics with expertise in the petroleum industry and on oil prices. Frank prefaces his remarks by indicating that oil companies have widely divergent needs with respect to crude oil because of the variety of finished oil products, inventories of crude on hand, location and types of refineries, and other factors. In evaluating Pan–Islamic's contract, Frank looked not at the particular companies' characteristics and needs, but only at general market conditions with respect to price. The most comfort Pan–Islamic may derive from Frank's affidavit is his conclusion that the price at which Pan–Islamic agreed to purchase from Sonatrach was "well within the range at which free arm's length sales of Algerian crude took place during the spring and early summer of 1971." Frank indicates that the range of Algerian crude

---

**40.** At that time, Shell was purchasing domestic oil at a delivered price of $3.825 per barrel at its Houston refinery, $4.05 at its Illinois refinery, and $3.67 at its Louisiana refinery.

**41.** The amount was 250,000 barrels.

**42.** Pan–Islamic offers absolutely no rebuttal to Sun's statement that it refused the oil also because it had been given no sample to test or to Shell's statement that whenever it needed to purchase oil at this time, it was able to meet its needs with purchases of domestic oil.

oil at this time was anywhere between $2.80 and $3.20 per barrel f. o. b. Algeria. In face of the lack of a single market price of Algerian crude, the practice of the defendants to rely on offers they received to determine market price, the range of oil prices for Algerian crude at this time, and the volatility of oil prices, a conclusion that Pan–Islamic's contract price was "within the range" of market prices is hardly significant probative evidence rebutting the sworn statements of company officials that they unilaterally determined Pan–Islamic's price to be noncompetitive.

Frank also evaluated Pan–Islamic's contract as a long–term contract in light of the option agreement for five years. He concluded that when account is taken of all existing facts as of the relevant date in 1971, including conditions that could have been anticipated as likely to occur over the option period, conditions he believed in all probability were known to the oil companies in 1971, Pan–Islamic's contract was desirable from an economic point of view. We conclude that this portion of Frank's affidavit is irrelevant. It is premised upon an assumption that Pan–Islamic offered the oil companies the benefit of the escalation clause. The record, however, does not bear out Pan–Islamic's argument, made for the first time on appeal, that Pan–Islamic offered the defendant oil companies a multi–year contract. Pan–Islamic's complaint made no allegation concerning a multi–year offer made to the oil companies. In the description given by the oil company executives of the offer received, no mention is made of the benefits of the escalation clause.[43] In making their contention that their refusal of Pan–Islamic's offer was unilaterally based on considerations of price, the oil company officials made no reference to the need to consider conditions for the next five years in reaching this decision. Despite having these affidavits in hand well before the trial court was to rule on the summary judgment motion, Pan–Islamic failed to rebut the oil company officials' characterization of the offer. In over 2,000 pages of deposition of Pan–Islamic officials, none stated that the benefits of the escalation clause were offered to the defendants. In fact, Mr. Musslewhite, who has represented Pan–Islamic for much of this case, described the offer as for one year during his questioning of Routhier.

Pan–Islamic states that the fact that the contract with the option agreement was left with the oil company officials creates a factual issue as to whether the escalation benefits were offered.[44] The record, however, indicates that the reason Pan–Islamic showed the contract to Shell and Texaco was to assure them that they did have a contract with Sonatrach and could deliver the oil. Even if the oil companies knew that Pan–Islamic had a multi–year option, that does not constitute a multi–year offer by Pan–Islamic. We believe that leaving the contract with the officials is not "the substantive probative evidence" of a multi–year offer which is required to preclude summary judgment.

Moreover, we note that Prof. Frank's affidavit was the last document filed by Pan–Islamic in opposition to the defendants' motion for summary judgment. In its arguments to the district court, Pan–Islamic failed to indicate that it believed a factual issue existed as to whether the escalation clause benefits were included in the offer to the companies. This court has held that when a party moving for summary judgment assumes there is no factual controversy with respect to an issue, the opposing party's silence will preclude a belated argument on appeal based on some factual issue implicit in the underlying documents but not asserted before the trial court. *Franz Chemical Corp. v. Philadelphia Quartz Co.*, 594 F.2d 146 (5th Cir. 1979). The rule is appropriate in this case.

## V. Conclusion.

After a thorough review of the record in this case, we conclude that the district court

---

43. For example, Sun described the offer as being for 80 million barrels, the amount of Pan–Islamic's contract without the option.

44. The record indicates that Sun and Exxon were never shown, much less given, complete copies of Pan–Islamic's contract with Sonatrach.

committed no errors. Our review of Pan–Islamic's amended complaint reveals a lack of standing with respect to most of the claims alleged. With respect to the claim with which Pan–Islamic arguably had standing, its original complaint sufficiently pled this claim. Accordingly, there was no abuse of discretion by the district court in denying leave to file the amended complaint. Pan–Islamic had sufficient opportunity to conduct discovery and failed to utilize profitably the time available. After its lackadaisical effort at discovery, Pan–Islamic was unable to respond to the defendant oil companies' motion for summary judgment, well supported by affidavits from responsible purchasing officials denying participation in any conspiracy to boycott Algerian oil. Because Pan–Islamic has not come forth with the necessary significant probative evidence of a conspiracy, either by direct evidence, circumstantial evidence, or evidence in the nature of conscious parallelism, the district court's decision to grant summary judgment is affirmed.

AFFIRMED.