Stephen F. BRILL and Linda F. Brill

v.

CATFISH SHAKS OF AMERICA, INC.,
William Malone, and C.D. Malone, Sr.

Civ. A. No. 86-3345.

United States District Court,
E.D. Louisiana.

Oct. 10, 1989.

Gregory Thomas, Monroe & Lemann, New Orleans, La., Mark Rollinson, Rollinson & Zusman, Alexandria, Va., for plaintiffs.

Gerald Wasserman, Bach & Wasserman, Metairie, La., for defendant, Catfish Shaks of America, Inc.

Warren Horn, Adams & Reese, New Orleans, La., for defendants, William Malone and C.D. Malone, Sr.

## MEMORANDUM OPINION

MENTZ, District Judge.

Plaintiffs, Stephen and Linda Brill, filed this diversity suit against defendants, Catfish Shaks of America, Inc. (Catfish Shaks), William Malone, and C.D. Malone, Sr., seeking recovery for losses allegedly sustained in connection with the purchase of a Catfish Shaks restaurant franchise. The Brills sued based on violation of the Louisiana Unfair Trade Practices and Consumer Protection Act (LUTPA), La.Rev.Stat. Ann.

§ 51:1405(A) (West 1987), and breach of the implied covenant of good faith and fair dealing.[1] Catfish Shaks counterclaimed for unpaid royalties and advertising fees. The parties agree that Louisiana law applies.

## FACTS

Catfish Shaks is a family restaurant franchise chain serving country cooking and seafood. Stephen and Linda Brill purchased a Catfish Shaks franchise for the Kenner, Louisiana area on March 12, 1984. Within two years of purchasing the franchise, they permanently closed the restaurant never having operated at a profit.

The Brills claim to have lost over $400,-000.00 in start up costs, personal guarantees on loans, and lost income all as a result of the alleged acts and/or omissions of the defendants. Specifically, the Brills allege that defendants are liable for:

1) failing to provide a franchise disclosure document as required by Federal Trade Commission (FTC) regulations, 16 C.F.R. § 436 (1984);

2) failing to provide the Brills with an audited financial statement;

3) failing to inform the Brills that the contract with Justin Wilson, a public figure who acted as spokesperson for the franchise restaurants, was only a two-year, renewable contract;

4) failing to inform the Brills that the trademark registration of the catfish logotype had been challenged by a competitor;

5) failing to inform the Brills that the officers and directors of Catfish Shaks were inexperienced;

6) providing the Brills with five year profit projections which were misleading due to the omission of three significant expenses;

7) firing Stephen Brill from his position as manager of a company-owned Catfish Shaks prior to the opening of his restaurant;

8) providing the Brills with inadequate building plans;

9) failing to provide the Brills with an opening promotion;

10) failing to provide adequate advertising; and

11) informing the Brills that the franchise chain was going to be purchased by one, Charles Fail, who intended to improve the franchise operations, and subsequently failing to execute the Fail contract.

Upon defendants' pre-trial motion to dismiss the claim for violation of the LUTPA, the Brills conceded that their LUTPA claim is preempted as to any acts occurring before July 31, 1985, one year prior to filing suit. At the hearing on the motion, plaintiffs sought leave to amend their complaint to allege a third-party beneficiary claim and negligent misrepresentation.[2] The Court denied the motion to amend as untimely.

At the bench trial, the Brills again tried to raise the third-party beneficiary issue. Stephen Brill testified that Charles Fail and an unnamed franchisee, both non-parties, separately informed him that Fail planned to purchase the franchise chain. Brill further testified that he continued operating his unprofitable business in reliance on Fail's promise that he would provide financial assistance and better advertising, and that he suffered harm due to Catfish Shaks' failure to execute the contract with Fail. Defendants objected to this testimony on the ground that the Court previously denied the Brills' pre-trial motion to amend. After the Brills rested their case, defendants moved for involuntary dismissal of any third-party beneficiary claim. Considering that the third-party beneficiary issue was not included in the pre-trial order and further, that the Brills had not shown the existence of a contract for their benefit, the Court granted defendants' motion to dismiss pursuant to Fed.R.Civ.P. 41(b).

---

1. There are no allegations of fraud or breach of express contract terms.

2. The Brills never before asserted these causes of action, apparently preferring to rely on their claim under the LUTPA, which provides for punitive damages and attorneys fees.

In their post-trial brief, the Brills claim for the first time that defendants are liable under a theory of negligent misrepresentation. The Brills argue that even though negligent misrepresentation was not expressly pleaded, the issue was tried by implied consent of the parties and no formal amendment is necessary, citing *Silver v. Nelson*, 610 F.Supp. 505, 519–21 (E.D.La. 1985). Review of the pre-trial order and the trial proceedings show that negligent misrepresentation was fairly placed in controversy such that defendants would not be prejudiced if the Court were to find an implied amendment under Fed.R.Civ.P. 15(b) and to address the merits of the claim. Nevertheless, to allow an implied amendment would be a futile gesture because the negligent misrepresentation claim prescribed before plaintiffs filed suit on July 31, 1986.

 A claim for negligent misrepresentation is a tort action encompassed by Louisiana Civil Code article 2315, *see Dousson v. South Central Bell*, 429 So.2d 466, 468 (La.App. 4th Cir 1983) (citing *Devore v. Hobart Mfg. Co.*, 367 So.2d 836 (La.1979), *Hoffman v. Sabre Marine, Inc.*, 407 So.2d 516 (La.App. 4th Cir.1981)), with a one-year prescriptive period running from the date of injury or damage, *see* La.Civ.Code Ann. art. 3492 (West Supp.1989).[3] Through the exercise of reasonable diligence the Brills should have been aware of a cause of action for negligent misrepresentation prior to July 31, 1985. The doctrine of *contra non valentem* cannot apply to suspend the running of prescription because there is no evidence that the Brills were unable to exercise this cause of action.[4]

 The Brills argue that defendants' settlement offer to forgive royalties and advertising fees acts as an acknowledgment of the implied cause of action for negligent misrepresentation, thereby interrupting prescription. *See* La.Civ.Code Ann. art. 3464 (West Supp.1989).[5] The Court questions whether there can be an acknowledgment of an implied cause of action. In any event, the settlement offer was made one month prior to trial, long after the prescriptive period had run and therefore, it cannot serve to interrupt prescription. As an implied amendment adding the issue of negligent misrepresentation would be subject to dismissal on the ground of prescription, it will not be recognized. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 226 (1962); *Pan–Islamic Trade Corporation v. Exxon Corporation*, 632 F.2d 539, 546 (5th Cir.1980); *DeLoach v. Woodley*, 405 F.2d 496, 497 (5th Cir.1969).

Plaintiffs have no cause of action for negligent misrepresentation based on any acts occurring after July 31, 1985. The only allegations involving matters occurring after July 31, 1985, relate to the Charles Fail negotiations with Catfish Shaks. The facts do not support a cause of action for negligent misrepresentation based on the Charles Fail negotiations because defendants made no representations to the Brills about Fail.

Accordingly, the Brills' remaining causes of action are for violation of the LUTPA insofar as acts subsequent to July 31, 1986, and breach of the implied covenant of good faith and fair dealing.

## I. LUTPA VIOLATIONS SUBSEQUENT TO JULY 31, 1985

 As stated, the only allegations relating to facts occurring subsequent to July 31, 1985, concern Charles Fail's desire to

---

**3.** Article 3492 provides:

> Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained.

**4.** The doctrine of *contra non valentem* applies: Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. (This principle will not except the plaintiff's claim from the running of prescrip-

tion if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned....).

*Corsey v. Department of Corrections*, 375 So.2d 1319, 1322 (La.1979).

**5.** Article 3464 provides:

> Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe.

purchase Catfish Shaks. In the spring of 1985, the Brills were contacted by Charles Fail, who stated that he was going to purchase the Catfish Shaks chain and would give the franchisees better support than the current owners. Stephen Brill also heard rumors from other franchisees that Fail was negotiating the purchase of Catfish Shaks. The Brills argue that the defendants are liable to them under the LUTPA because the Brills remained in business, even though they continued to suffer losses, based on *Fail's* representations that the franchisees' situation would improve once Catfish Shaks was under his control.

The LUTPA, La.Rev.Stat.Ann. § 51:1405(A) (West 1987), declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.

> [A] practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers and consumers include business competitors. ... Admittedly, the definition of what may constitute an unfair act or practice is broad and subjective. Thus, it is best that the determination of what may amount to an unfair act or practice remain the province of the courts applied on a case by case basis.

*Roustabouts, Inc. v. Hamer*, 447 So.2d 543, 548 (La.App. 1st Cir.1984).

Defendants have no liability to the Brills under the LUTPA. The Brills failed to produce any evidence that any of the defendants acted in violation of the LUTPA subsequent to July 31, 1985. In this regard, the Court notes that defendant, C.D. Malone, Sr., left the employ of Catfish Shaks in May, 1985. Furthermore, none of the defendants made any representations to the Brills about the possible sale of Catfish Shaks to Fail. Defendants cannot be held liable for Charles Fail's representations. Fail acted on his own and in connection with his own interests when he made representations to the Brills about purchasing Catfish Shaks.

## II. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The Brills claim that defendants violated the implied covenant of good faith and fair dealing in several different respects, discussed specifically below. They assert this claim as a contract action, which has a ten year prescriptive period.[6]

As a general rule, there is an implied covenant of good faith and fair dealing in every contract. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir.1984); *Bonanza International, Inc. v. Restaurant Management Consultants, Inc.*, 625 F.Supp. 1431, 1445 (E.D.La.1986); Restatement (Second) of Contracts § 205.

In Louisiana the requirement that all contracts must be performed in good faith is codified in the Civil Code articles relative to obligations.[7] Former Civil Code Article 1901[8] provided:

**6.** "A tort claim for breach of the implied covenant of good faith and fair dealing requires proof of a special relationship between the parties, characterized by elements of public interest, adhesion and fiduciary responsibility." *Tominaga v. Shepherd*, 682 F.Supp. 1489, 1498 (C.D.Cal.1988). "Except in cases of franchise termination, in which courts have refused to give literal effect to the language of the franchise agreement, courts have not imposed general fiduciary obligations upon franchisors." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir.1984). *See also Picture Lake Campground v. Holiday Inns, Inc.*, 497 F.Supp. 858, 869 (E.D.Va.1980) ("A franchise relationship is inherently a business relationship, not a fiduciary relationship.")

**7.** In 1984, the obligations articles were revised and reenacted, effective January 1, 1985. As the main transaction at issue in this case is the Brills' March 12, 1984 franchise purchase, the substantive laws to be applied are those in effect in 1984. *See* La.Civ.Code Ann. art. 6 (West Supp.1989) ("In the absence of a contrary legislative expression, substantive laws apply prospectively only.") However, the outcome of this suit would not be different were the Court to apply the post–1984 law.

**8.** The substance of former article 1901 now appears at article 1983:

> Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on the grounds provided by law. Contracts must be performed in good faith.

Agreements legally entered into have the effect of laws on those who have formed them.

They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

*They must be performed in good faith.* (Emphasis added).

The term "good faith" is not defined in the Civil Code articles on obligations. Louisiana courts provide little guidance as to when conduct in the contractual setting violates the implied covenant of good faith. Prior to the 1984 revisions, former article 1934 defined bad faith as not a "mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will." *See* La.Civ.Code art. 1934(1) (West 1972 Compiled Edition); *Williams v. Coe,* 417 So.2d 426, 430 (La.App. 1st Cir.1982); *Williams Engineering, Inc. v. Goodyear,* 480 So.2d 772, 780 (La.App. 5th Cir.1985).[9] As the definition of bad faith clearly requires a subjective analysis, one may conclude that good faith is likewise measured by a subjective standard.

The Brills argue that good faith performance means "honesty in fact". This is a common law definition of good faith found in Louisiana's Commercial Laws which were adopted from the Uniform Commercial Code (UCC).[10] Like the Civil Code's requirement that all contracts be performed in good faith, the Commercial Laws provide that "every contract or duty within this Title imposes an obligation of good faith in its performance or enforcement." *See* La.Rev.Stat.Ann. § 10:1–203 (West 1983). In 1984, the Commercial Laws defined good faith as "honesty in fact in the conduct or transaction concerned," *see* La. Rev.Stat.Ann. § 10:1–201 (West 1983).[11] This definition is a verbatim adoption of § 1–203 of the UCC. It is not necessarily incompatible with the nature of good faith in the Civil Code, because "honesty in fact"

---

The amendment and reenactment of former article 1901 did not change the law. La.Civ.Code Ann. art. 1983 (Comment).

The good faith requirement in former article 1901 is also found in new article 1759:

Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation.

**9.** The definition of bad faith contained in former article 1934(1) was not reenacted. (The substance of all other provisions in former article 1934(1) are found in new article 1995.) However, the Comment to new article 1997 on the liability of an obligor in bad faith, explains that bad faith is "an intentional or malicious failure to perform." At least one case has distinguished this standard from that contained in former article 1934(1). *See E.B. Ludwig Steel v. C.J. Waddell,* 534 So.2d 1364, 1371 (La.App. 5th Cir.1988). The court in *Ludwig* apparently believed that the malice is not the same as ill will. *See Id.* Arguably, ill will is not as bad as malice, ill will being commonly defined as an "unfriendly feeling", and malice being defined as a "desire to harm others." *See* The American Heritage Dictionary 642 and 759 (2d Collge Ed. 1985). On the other hand, at least two dictionaries refer to malice and ill will as synonyms. *See Webster's New Collegiate Dictionary* 571 and 696 (1975) and *The American Heritage Dictionary of the English Language* 790 (1970). Regardless, both terms require at least an *intentional* failure to perform.

**10.** Effective January 1, 1975, Louisiana adopted part, but not all of the UCC. Louisiana's version of the U.C.C. is Title 10 of Louisiana's Revised Statutes, referred to as Commercial Laws. *See* La.Rev.Stat.Ann. § 10:1–101 (West 1983).

**11.** In 1988, the Commercial Laws were amended to modify the definition of good faith. By Act 306, H.B. 898, the 1988 Regular Session of the Legislature added a second sentence to § 10:1–203 to make the Commercial Laws' definition of good faith be based on the Civil Code.

Every contract or duty within this Title imposes an obligation of good faith in its performance or enforcement. *The standard of good faith performance required under this Title shall be based upon Civil Code Articles 1983, 1996, and 1997.*

La.Rev.Stat.Ann. § 10:1–203 (West Supp.1989) (Emphasis added). The Legislature did not repeal the "honesty in fact" definition, but added the phrase, "except as provided herein." *See* La.Rev.Stat.Ann. § 10:1–201 (West Supp.1989).

H.B. 898 originated in the Louisiana House of Representatives' Civil Law and Procedure Committee. David Willenzik, of the Louisiana Bankers' Association, spoke on behalf of the bill for Representative Robert Waddell, Chairman of the Committee. Willenzik stated that the bill would not repeal the definition of good faith, but would make certain that Louisiana standards, rather than common law standards, apply to commercial transactions. *See* Minutes of Meeting, House Committee on Civil Law and Procedure (May 17, 1988).

also applies a "subjective standard of good faith, one that focuses on the actor's actual state of mind." Case Comment, *Sailing the Unchartered Seas of Bad Faith: Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 69 Minn.L.Rev. 1161, 1165 (1985); *see also Marsh Investment Corporation v. Langford*, 554 F.Supp. 800, 805 (E.D.La.1982). (La.R.S. 10:1–201 clearly establishes "a subjective standard for measuring good faith, that is, good faith in fact—the old white heart and empty head standard. J. White & R. Summers, Uniform Commercial Code § 6–3, at 218.").

The Court is mindful that common law commentators have criticized using a subjective standard for good faith to measure good faith performance of general contractual obligations. *See* Comment, *Sailing the Unchartered Seas of Bad Faith, Id.* (citing Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code*, 30 U.Chi.L.Rev. 666, 668–72 (1963)); Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Vand.L.Rev. 195, 207–15 (1968). These commentators argue that good faith performance should be measured by an objective standard of fairness and reasonableness.

The merits of an objective versus a subjective standard are not for this Court to decide. Louisiana did not adopt the Sales Article of the UCC (Article 2), which includes an objective standard of good faith: "honesty in fact *and the observance of reasonable commercial standards of fair dealing in the trade." See* U.C.C. § 2–103(1)(b) (Emphasis added). The fact that the Legislators incorporated this objective standard of good faith in the Louisiana Procurement Code, La.Rev.Stat.Ann. § 39:1551 et seq. (West 1989), (dealing with state expenditure of public funds), shows a willingness to impose a higher standard in certain circumstances. However, there is no provision in Louisiana law to support application of an objective standard of good faith to the case at bar.

This Court is bound to apply Louisiana law. Having considered the case law, the Civil Code, and the Revised Statutes, the Court finds that under Louisiana law, the implied covenant of good faith performance of conventional obligations or contracts is not measured by a higher objective standard, but by a subjective standard. A mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith.

**A. Disclosure Document**

The Federal Trade Commission (FTC) regulations require a franchisor to provide a prospective franchisee with a disclosure document at the first personal meeting, ten days prior to receipt of a franchise fee, or upon the signing of a franchise agreement, whichever is earlier. 16 C.F.R. §§ 436.1(a), 436.2(g) (1984). The regulations attempt to create a minimum federal standard of disclosure applicable to all franchise offerings. The disclosure document must disclose in a specified order details about twenty categories of information relating to the franchisor's finances and operations. 16 C.F.R. § 436.1(a)(1–20) (1984). The regulations provide that it is an unfair or deceptive act or practice for a franchisor to fail to provide a franchisee with this information. 16 C.F.R. § 436.1(a) (1984). Intent and actual harm are not required to establish a violation of the regulations. However, as there is no private right of action for violation of the FTC's franchise disclosure rules, *see Freedman v. Meldy's, Inc.*, 587 F.Supp. 658 (E.D.Pa. 1984); *Mon–Shore Management, Inc. v. Family Media*, 2 Bus. Franchise Guide (CCH) ¶ 8494 (S.D.N.Y. Dec. 23, 1985), and the Brills' claims under the LUTPA and for negligent misrepresentation are time-barred, the Brills are left with a claim for breach of the implied covenant of good faith, which as discussed above, requires a showing of intent.[12]

---

12. Although many states have enacted franchise disclosure statutes which entitle the franchisee to recission and/or damages for failure to provide a disclosure document, Louisiana has no such statute. Some franchisees in states without franchise disclosure statutes have alleged

■ It is uncontested that Catfish Shaks did not give the Brills a franchise disclosure document until April, 1985, over a year after they purchased the franchise. The Brills argue that the defendants breached the implied covenant of good faith by failing to provide them with a disclosure document before they purchased the franchise, as well as certain specific information which would have been included in a proper disclosure document. Specifically, the Brills claim that defendants failed to provide them an audited financial statement and failed to inform them that: the company spokesperson, Justin Wilson, had only a two-year, renewable contract; the catfish logotype had been challenged by a competitor; and the officers and directors of Catfish Shaks were inexperienced.[13] There is no allegation that the defendants made any affirmative misrepresentations about these categories of information.

When the Brills purchased the franchise, Catfish Shaks did have a disclosure doc-ument, which it usually provided to prospective franchisees. For unknown reasons, it was not provided to the Brills. In April, 1985, the Brills received a disclosure document for the first time. This document was a revision of the original disclosure document which the Brills never received. The original disclosure document was revised upon advise by Catfish Shaks' attorneys that it was not adequate.

One might speculate that the reason the Brills were not given a disclosure document at the time they purchased the franchise was because Catfish Shaks believed Stephen Brill was familiar with the company's operations. Stephen Brill had been managing a company-owned Catfish Shaks since 1983, and from 1981 to 1983, he had managed a Western Sizzlin owned by Malone Properties, a company affiliated with Catfish Shaks. In any event, there is no evidence that the defendants intentionally or maliciously failed to provide a disclosure document or to inform the Brills about any

---

that the failure to provide a disclosure document is a per se violation of the state's unfair trade practices act. *See LeBlanc v. Belt Center, Inc.,* 509 So.2d 134 (La.App. 1st Cir.1987); *Morgan v. Air Brook Limousine, Inc.,* 211 N.J.Super. 84, 510 A.2d 1197 (Law Div.1986). *See also Bailey Employment System, Inc. v. Hahn,* 545 F.Supp. 62 (D.Conn.1982) (the failure to disclose certain material information in the disclosure document constitutes a violation of the CUTPA without any showing of reliance or intent to deceive.) In *Morgan,* the New Jersey Superior Court referred to the FTC Rule as a minimum standard of fairness in holding that the failure to provide a disclosure document is a *per se* deceptive act or practice in violation of New Jersey's Consumer Fraud Act. In *LeBlanc,* the only case in Louisiana to address the subject, the appellate court found that the failure to provide a disclosure document is not *per se* violative of Louisiana's UTPA because an unfair trade practice requires a showing of fraud, misrepresentation, deception, or unethical conduct. *LeBlanc* has been criticized for imposing an intent requirement under the LUTPA in cases involving violations of the FTC rules. *See* Ronald L. Hersbergen, *Violations of the FTC Act as Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law,* 48 La.L.Rev. 251 (1987). Nevertheless, had the Brills LUTPA claim not been preempted, the Court would be bound to follow *LeBlanc.* Thus, under either the LUTPA or the implied covenant of good faith, the Brills would face a subjective burden of proof.

**13.** If the Brills had been provided a proper disclosure document under the FTC Rules, it would have included the following audited statements: "a balance sheet (statement of financial position) for the franchisor for the most recent fiscal year, and an income statement (statement of results of operations) and statement of changes in financial position for the franchisor for the most recent three fiscal years." 16 C.F.R. § 436.1(a)(20). It would also disclose: "the nature and extent of [a] public figure's involvement and obligations to the franchisor," 16 C.F.R. § 436.1(a)(19)(i); whether the franchisor is a party to litigation "currently pending in which [a restrictive order] is sought, relating to or affecting franchise activities or the franchisor-franchisee relationship," § 436.1(a)(4)(iii); and "the business experience during the past five years, stated individually, of each of the franchisor's current directors and executive officers", § 436.1(a)(2). Whether the Brills' allegations regarding defendants' failure to make certain disclosures constitutes a violation of the FTC is not at issue because, as stated, there is no private right of action under the FTC. Arguably, the FTC regulations would be relevant as a minimum standard of reasonableness and fairness in a jurisdiction which applies an objective standard of good faith. The regulations are not relevant in the case at bar because the Court must examine the defendants' intentions.

franchise operations, or that they made any affirmative misrepresentations about matters which would have been revealed in a disclosure document. The fact that Catfish Shaks took steps to improve the disclosure document and to send it to current franchisees supports finding that defendants were not trying to conceal or misrepresent facts. Accordingly, the Court finds that defendants did not breach the implied covenant of good faith when they failed to provide the Brills with a disclosure document at the time they purchased the franchise.

### B. Audited Financial Statement

The Brills contend for the first time in their post-trial brief that at the time they purchased the franchise, they were not given an audited financial statement and that, in fact, one was not available because the company's records were such that an audit could not have been made. The evidence does not support this contention. Catfish Shaks had an audited financial statement for 1983, the year before the Brills purchased the franchise. There is no evidence as to whether it was provided to the Brills. To find that it was or was not provided would be speculation. Even assuming that the audited financial statement was not made available to the Brills, there is no evidence that defendants intentionally withheld it.

### C. Justin Wilson

■ When the Brills purchased their franchise, Justin Wilson, a well-known television personality, cook, food critic, and author of recipe books, had a personal service contract with Catfish Shaks to help promote the restaurant chain. In addition to making public appearances for the restaurants, his picture appeared on Catfish Shaks' menu and in advertisements. Stephen Brill testified that, even though no one ever made any representations to him about Justin Wilson, he assumed Wilson's relationship with the company was perma-

nent. The Brills did not learn that Wilson's contract was a renewable, two-year contract until a year after they purchased the franchise. By letter dated March 22, 1985, Catfish Shaks informed the Brills that Justin Wilson's contract would expire on April 30, 1985, that it would not be renewed, and that all uses of Wilson's name and likeness would have to cease on April 30, 1985.

The Brills have not shown that the defendants violated the implied covenant of good faith by failing to tell the Brills at the time they purchased the franchise that Justin Wilson's contract was a renewable, two-year contract. There is no evidence that the defendants purposefully failed to provide or concealed such information. Before Wilson decided not to renew his contract in 1985, the defendants had no knowledge as to how long the relationship with Wilson would last. The contract might have been renewed every two years or it might have been terminated after the first two years, as in fact it was.

### D. Catfish Logotype

■ Catfish Shaks' logotype is an animated catfish, which appeared on the restaurants' sign and menu. On April 4, 1984, a few weeks after the Brills purchased their franchise, a petition for cancellation of the registration on the catfish logotype was filed in the United States Patent and Trademark Office by Ralph & Kacoo's, a seafood restaurant chain. Catfish Shaks did not inform the Brills that the catfish logotype had been challenged until it delivered the franchise disclosure document in April, 1985. Catfish Shaks continued to use the catfish logotype throughout the period the Brills operated their restaurant. The Trademark Trial and Appeal Board cancelled the catfish logotype used by Catfish Shaks on August 3, 1988.[14]

There is no evidence that the defendants intentionally failed to advise the Brills that Ralph & Kacoo's was seeking cancellation of the logotype. However, even if the Brills were able to show some intent in the

---

**14.** The Court takes judicial notice of the filing and cancellation dates which were not placed in

evidence by either party.

defendants' failure to disclose the challenge, there is no evidence that such a failure to disclose caused the Brills harm. Certainly, the Brills' decision to purchase the franchise was not affected because the logotype was not challenged until after the Brills purchased the franchise. It would not have lessened the Brills' risk of harm had they been informed about the challenge in April, 1984. The challenge to the catfish logotype was not the sort of litigation involving allegations of fraud that might warn a franchisee to protect himself from the same or similar type of fraudulent activity. Moreover, they were never precluded from using the logotype. They continued to use the logotype until they closed their restaurant in September, 1986 and the logotype was not cancelled until two years thereafter.

### E. Experience of Catfish Shaks' Officers and Directors

■ Carole D. Malone, Jr. (Carole) was the founder of Catfish Shaks. He opened the first Catfish Shak restaurant in April, 1981. He died in an airplane crash in December, 1983. His father, C.D. Malone, Sr. (C.D.), took over management of the company.[15] William Malone, Carole's brother, and Lolita Malone, Carole's widow, were named co-executors of his estate. As co-executors, they voted the shares of stock, but neither was involved in the day-to-day management of Catfish Shaks. As Lolita Malone was severely injured in the airplane crash, she did not begin voting until the summer of 1984. In the interim, the company was run according to the desires of C.D. Once Lolita began voting, the company became deadlocked. It is not known what matters were being put to vote, only that Lolita and C.D. directly opposed each other. Lolita's stated position was to take whatever action would be necessary to fulfill her late husband's wish that the company continue, while C.D.'s stated position was concern for the welfare of his grandchildren. The opinion of the company's

Chief Financial Officer, Donald Skelton, was that neither Lolita nor C.D. was completely honest about their intentions and that they both made company decisions based on how it would affect them personally. A family feud of sorts also arose between the Malones about benefits they each received from the company. The evidence suggests that the blood relatives were overcompensating themselves for their work in the company, but to what extent is not clear. Although there is no evidence that Lolita directly received money from the company, she was to inherit property from Carole's estate and the company made mortgage payments on that property.

The Brills argue that at the time they purchased the franchise, defendants did not disclose that the management of Catfish Shaks was inexperienced. When the Brills purchased their franchise, C.D. had been managing the company for only a few months. While there is no evidence of C.D.'s past business experience, Donald Skelton testified that none of the blood relatives would be able to get the same work or rate of compensation on the open market. In addition, there is evidence that C.D. was "tough" to deal with and that Justin Wilson did not renew his contract with Catfish Shaks due to strained relations with him.

While it would appear that C.D. Malone was not experienced in operating a company like Catfish Shaks, this is a fact that the Brills should have known. Stephen Brill had been managing a company-owned Catfish Shaks for several months before Carole's death, and he was an employee of a company affiliated with Catfish Shaks, Malone Properties, from 1981 to 1983. Thus, he at least had actual knowledge that C.D. had been with the company for only a few months and that due to Carole's death, the company might be in a state of flux. The Court can find no breach of good faith in failing to tell the Brills about a fact that

---

**15.** Jack B. Malone, Carole Malone, Jr.'s brother, was President of Catfish Shaks when the Brills purchased their franchise, but other than acting as signatory for Catfish Shaks on the franchise documents, there is no evidence that Jack Malone played any role with respect to the Brills' purchase or operation of their franchise.

should have been self-evident. In any event, there is no evidence that defendants intentionally failed to tell the Brills about C.D. Malone's lack of experience.

### F. Five-year Profit Projections

Catfish Shaks helped the Brills prepare a 45–page financial package to attract bank financing for their restaurant. Included in the package are three five-year profit projections for the Brills' restaurant.[16] The projections do not purport to show profit projections for Catfish Shaks or an average sales level for current franchisees. Each of these one-page projections is entitled:

"Five Year Profit and Loss Pro Forma:
 Stephen Brill
Catfish Shak Plantation Restaurant:
 Kenner, Louisiana"

The projections represent three scenarios. The first scenario reflects a break-even first year with 15% increases in revenues for five years thereafter. The second scenario reflects first year revenues equal to 155% of break-even revenues with 15% annual increases in revenues for five years thereafter. The third scenario reflects first year revenues equal to 248% of break-even revenues with 15% annual increases in revenues for five years thereafter. The projections do not guarantee or represent that the Brills will make a certain level of income or profit.

The Brills contend that Catfish Shaks is liable for providing them misleading profit projections to obtain business loans which they personally guaranteed and on which they subsequently defaulted. Thus, the Brills' allegation with respect to the pro forma is not the typical franchisee complaint that misleading or false earnings projections were used to entice them to purchase their franchise. Indeed, there is no evidence that the profit projections were given to the Brills prior to purchasing the franchise or that they relied on the projections in deciding to make the purchase. Although the package is not dated and

there is no evidence as to when the package was prepared, review of Stephen Brill's resume, which is also included in the package, shows that he had already decided to purchase the franchise when the package was prepared.

Catfish Shaks cannot be held liable based on the profit projections for several reasons. First, there is no evidence that any bank relied on the pro forma to loan the Brills money or that the Brills relied on the pro forma to make personal guarantees.

Second, assuming that Catfish Shaks prepared the profit projections, there is a reasonable basis for the figures used. When the projections were made in 1984, the most recent earnings information available for Catfish Shaks was the 1983 audited statement of income. In 1983, Catfish Shaks had gross sales of $1,017,560.00 and expenses of $984,060.00, resulting in a profit of $33,500.00. The 1985 figures in the first scenario profit projections, i.e., (the projection showing 1984 as a break-even first year and a 15% increase in revenues thereafter) shows $964,230.00 in gross sales and $927,002.00 in expenses, resulting in a profit projection of $37,228.00. Thus, the 1985 projection in the first scenario is comparable to the actual experience of Catfish Shaks in 1983.

Third, even though the profit projections omitted three line item expenses typically included in a pro forma: maintenance, interest, and depreciation, there is no evidence that the defendants intended to deceive the Brills. These three expenses totalled $59,501.00 for the first full year of the Brills' operation ending December 31, 1985. During that period, the Brills incurred $9,356.00 for maintenance; $15,436 for interest; and $34,709.00 for depreciation/amortization. However, Catfish Shaks' own experience was substantially similar to the expense figures used in the projections. The omitted expenses were nominal for Catfish Shaks as they owned their facilities. Catfish Shaks did not have any interest expenses and its maintenance

---

**16.** Also included in the package is a one year profit and loss pro forma statement of operations for Catfish Shaks. There is no allegation the pro forma for Catfish Shaks is inaccurate or improper in any way.

and depreciation/amortization expenses totalled only $1,719.00. In addition, the fact that Catfish Shaks included a large expense item that it did not have itself, that is, $126,000.00 for rent, shows a lack of intent to deceive the Brills.

Fourth, the financial statements prepared for the Brills by the Court's Special Master shows that the difference between the first scenarios' projections for 1985 and the Brills' actual experience in 1985 was not caused by unanticipated expenses, but by a lack of sales. Poor sales could have been caused by numerous factors unrelated to any alleged act or omission of Catfish Shaks, such as mismanagement, a downturn in the economy, or a poor location. The Brills stipulated that they were not ready to operate their own restaurant and that they did not obtain any economic or marketing studies before purchasing the franchise.

G. Termination of Stephen Brill as manager of company-owned Catfish Shaks prior to the opening of the Brills' restaurant

■ When the Brills purchased the franchise, Stephen Brill was manager of a company-owned Catfish Shaks restaurant located in Metairie, Louisiana. Catfish Shaks terminated him in May, 1984, four months before the Brills opened their restaurant. Although there is no evidence of the reason for Brill's discharge, plaintiffs stipulated at trial that he was employed at will. Accordingly, he could be terminated at will with or without cause. *See Frichter v. National Life & Accident Insurance Co.*, 620 F.Supp. 922, 924–927 (E.D.La. 1985), *aff'd*, 790 F.2d 891 (5th Cir.1986). Therefore, the Court finds that defendants have no liability for terminating Brill four months prior to the scheduled opening of his restaurant.

H. Building Plans

The Brills allege that even though Catfish Shaks did not have a contractual duty to provide building plans for the construction of the restaurant, having undertaken such a duty, Catfish Shaks had an implied obligation of good faith and fair dealing to make sure the plans were adequate. Stephen Brill testified that due to deficiencies in the plumbing and electrical plans, as well as the omission of certain fixtures, like ice machines and cabinets, he incurred unexpected expenses. On cross-examination, Brill admitted that he modified the plans by adding a bar.

The Court finds that the Brills did not show that the plans as originally designed were inadequate or that defendants intentionally omitted essential construction. Even if the Court were to find that defendants were liable for the alleged extra expenses, any award of compensation would be speculative as there is no evidence of the amount of any construction expenses or that the alleged inadequate building plans contributed to the failure of the Brills' restaurant.

I. Opening Promotion

■ The Brills opened their Catfish Shak restaurant on September 24, 1984. Three Catfish Shaks employees helped the Brills set up their restaurant, but no Catfish Shaks personnel were present on opening day. Stephen Brill thought that Catfish Shaks was obligated to give him an opening promotion.

The Brills have not alleged breach of any express contract provisions and there is no evidence that Catfish Shaks made an oral or written representation to the Brills that they would be given an opening promotion. The Court finds that the implied covenant of good faith does not include an obligation of a franchisor to provide a franchisee with an opening promotion.

J. Advertising

Stephen Brill testified that he believed that Catfish Shaks failed to provide necessary advertising, but admitted that he received radio and TV tapes during September through November, 1984. There is no specific evidence as to the quantity and scope of advertising. The Brills stipulated that franchise royalties and advertising fees were not paid after November, 1984. Under these circumstances, the Court can-

not find that Catfish Shaks violated the implied covenant of good faith.

## III. COUNTERCLAIM

The franchise agreement provides that the Brills are obligated to pay to Catfish Shaks a monthly franchise fee of 3% of gross sales and a monthly advertising fee of 1% of gross sales. Gross sales means receipts from all sales at the Brills' restaurant, excluding state and local sales tax, cigarette or other vending machine commissions, and video game commissions and/or revenues. The Brills stipulated that they paid these fees for only two months (October–November, 1984), but there is no evidence as to the amount of fees paid.

In proving its counterclaim, Catfish Shaks relied on the Special Master's report showing annual gross sales for the Brills' restaurant in 1984, 1985, and 1986, together with the terms of the franchise agreement. The Brills did not oppose Catfish Shaks' counterclaim. As there is no evidence of the amount of fees actually paid by the Brills, or whether the gross sales shown in the Special Master's report included any of the excluded sales receipts, the Court is unable to calculate an exact amount of fees to which Catfish Shaks would have been entitled. However, in view of the Brills' post-trial admission in their proposed findings of fact and conclusions of law that Catfish Shaks is entitled to $47,699.00, the Court finds that Catfish Shaks is entitled to that amount, plus interest, from the date of judicial demand.

## IV. SPECIAL MASTER'S REPORT

Due to the fact that Catfish Shaks had not had an audited financial statement prepared since 1983, and in view of the complex accounting issues presented by the Brills' allegations, the Court appointed a Special Master, Barry Mabry, CPA. The Special Master prepared a detailed, 95–page report containing:

1) an explanation of the corporate relationships of entities owned at least partially by the Estate of Carroll D. Malone, Jr. or Malone Properties, Inc.;

2) an analysis of Catfish Shaks' financial position and results of business operations;

3) a summary of material inconsistencies in the financial information provided by Catfish Shaks to the Special Master;

4) an analysis of the Brills' results of business operations;

5) a comparison of the Brills' results of business operations to Catfish Shaks' results of business operations;

6) an analysis of the "Five Year Profit and Loss Pro Forma" provided to the Brills by Catfish Shaks;

7) a comparison of the pro forma break-even statement of operations for year one to the Brills' statement of operations for the twelve months ending December 31, 1985 (first full year);

8) a comparison of the pro forma break-even statement of operations for year one to Catfish Shaks' statement of operations for the twelve months ending December 31, 1983.

Although neither party offered the Special Master's report in evidence at trial or called the Special Master to testify, the parties stipulated the accuracy of the financial statements and financial information in the Special Master's report. Accordingly, the Court will adopt the Special Master's report and order that it be filed into the court record. *See* Fed.R.Civ.P. 53(e)(1), (2) and (4).

As Catfish Shaks' lack of an audited financial statement after 1983 precipitated the necessity of appointing a Special Master, the Court finds, in its discretion, that the Special Master's fee shall be paid by Catfish Shaks. *See* Fed.R.Civ.P. 53(a).

In view of the foregoing,

IT IS ORDERED that:

(1) Judgment be entered against plaintiffs, Stephen F. Brill and Linda F. Brill, in favor of defendants, Catfish Shaks of America, Inc., William Malone, and C.D. Malone, Sr., dismissing plaintiffs' claims with prejudice and costs, excluding the compensation of the Special Master.

(2) Judgment be entered in favor of plaintiff-in-counterclaim, Catfish Shaks of

**1048**

America, Inc., and against plaintiffs, Stephen F. Brill and Linda F. Brill, in the amount of $47,699.00, plus interest from the date of judicial demand, and costs, excluding the compensation of the Special Master.

(3) Defendant, Catfish Shaks of America, Inc., shall pay to the Special Master, Barry Mabry, the sum of $3,918.24, within 30 days.

(4) The preliminary injunction entered on April 24, 1987 is DISSOLVED.

(5) The Special Master's report is ADOPTED.

(6) The Clerk shall file the Special Master's report into the official court record.