**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-30364.

Rogers W. CLARK, Jr., Roger R. Burney, Franchise Management Unlimited, and Seven Mile Catering, a Michigan co-partnership, Plaintiff-Appellants,

v.

AMERICA'S FAVORITE CHICKEN COMPANY, a foreign corporation and Canadian Imperial Bank of Commerce, a foreign corporation, jointly and severally, Defendants-Appellees.

April 22, 1997.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before HIGGINBOTHAM, DAVIS and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants, owners of several Popeyes Fried Chicken franchises in Detroit, Michigan, appeal from the district court's summary judgment order dismissing their claims against America's Favorite Chicken ("AFC") and Canadian Imperial Bank of Commerce ("CIBC"). We affirm.

I.

Beginning in 1978, appellants Rogers Clark, Jr. and Roger Burney entered into option agreements with Popeyes Famous Fried Chicken Corporation ("Popeyes"), a corporate predecessor to appellant AFC. Under these agreements, appellants acquired the exclusive right to develop Popeyes franchises in a specified area of inner-city Detroit, Michigan. Over the next thirty-five months,

1

Clark and Burney opened nine such franchises. With Popeyes' consent, several of these stores were opened in close proximity to Churchs Fried Chicken restaurants, Popeyes' biggest competitor in the area.

Through a series of mergers in 1989, the Popeyes and Churchs systems came under common ownership. The new management company, Al Copeland Enterprises, Inc. ("ACE"), was controlled by Popeyes president, Al Copeland. Shortly after the merger, ACE implemented a "Strategic Realignment Plan" designed to increase the profitability of both systems. The plan reflected the historic marketing positions of the two systems, with Churchs focused more on value—"Big pieces, little price"—and Popeyes focused more on product quality—"Love that chicken." Under this plan, Churchs would continue to target the "low-end" of the bone-in chicken market by focusing on value, while Popeyes, which had experienced significant success with suburban and upscale urban locations, would continue to focus on the high quality and uniqueness of its product.

ACE's acquisition of Churchs was financed by a loan from a banking consortium led by appellee CIBC. In 1991 ACE fell behind on its loan payments, and CIBC and other creditors forced it into a Chapter 11 bankruptcy proceeding. ACE emerged from bankruptcy as AFC, America's Favorite Chicken, with CIBC as the majority shareholder. The company also had a new management staff chosen by CIBC. From appellants' perspective, the newly restructured company continued with little change the realignment and marketing plan

2

adopted by its predecessor.

Appellants claim that the marketing strategy adopted by ACE and then AFC had a detrimental effect on their business. They complain that they are forced through the franchise agreements to carry products, such as fruit cups and specialty salads, which have little appeal in their low-income, urban market; at the same time, they claim they are prevented from effectively advertising cheap, "dark-meat-only" and other chicken-dominated meals, all to the benefit of the area's Churchs restaurants, which are subject to none of these constraints. Appellants also allege that AFC has shared marketing and other trade secrets with competing Churchs restaurants in their area.

Appellants filed the current lawsuit against AFC and CIBC, alleging breach of contract, including breach of the implied covenant of good faith and fair dealing, violation of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), promissory estoppel, tortious interference with contract, and abuse of rights. AFC counterclaimed for an equitable accounting based on its position as a preferred shareholder in appellant Franchise Management Unlimited ("FMU"), a corporate franchisee controlled by Clark and Burney. The district court granted summary judgment in favor of AFC and CIBC on all claims, and appellants timely appealed.

II.

Appellants appeal only the district court's grant of summary judgment on their claims for breach of the implied covenant of good

3

faith and fair dealing, violation of LUTPA, and promissory estoppel. They also appeal the district court's order awarding AFC an equitable accounting in its role as a preferred shareholder in FMU. We conclude that summary judgment was properly granted on these claims and affirm for essentially the reasons assigned in the district court's well reasoned opinion of February 8, 1996. We address in more detail only appellants' claim for breach of the implied covenant of good faith and fair dealing.

## A.

We review the district court's grant of summary judgment de novo, applying the same standards as did the district court. *Stults v. Conoco, Inc.,* 76 F.3d 651, 654 (5th Cir.1996). Summary judgment is appropriate when the record reflects that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the evidence is considered in the light most favorable to the nonmoving party, once the moving party meets its initial burden of pointing out the absence of a genuine issue for trial, the burden is on the nonmoving party to come forward with competent summary judgment evidence establishing the existence of a material factual dispute. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)). Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment. *Duffy v.*

4

*Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986)).

B.

As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract. *Brill v. Catfish Shaks of America,* 727 F.Supp. 1035, 1039 (E.D.La.1989); *Bonanza Int'l, Inc. v. Restaurant Management Consultants, Inc.,* 625 F.Supp. 1431, 1445 (E.D.La.1986). However, as we explained in *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984), "[t]he implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them."

As our observation in *Domed Stadium* suggests, we begin our inquiry by examining the express terms of the contract. The franchise agreements at issue here expressly reserve the right of the franchisor to develop and establish competing franchise systems within appellees' territory. Section V.E of the franchise agreements provides in relevant part:

> E. Franchisee understands and agrees that its license under said Proprietary Marks is non-exclusive to the extent that Franchisor has and retains the rights under this Franchise Agreement:
>
> ...
>
> 2. To develop and establish other franchise systems for the same, similar, or different products or services utilizing Proprietary Marks not now or hereafter designated as part of the system licensed by this Franchise Agreement, and to grant licenses thereto, without providing Franchisee any right therein....

5

This language unambiguously reserves to AFC the right to enter appellants' area and compete against them under a different set of proprietary marks.[1]  Moreover, the record establishes that appellants were aware of the significance of this provision, and their attorney attempted to negotiate its removal from the franchise agreements.  When this attempt failed, appellants signed the agreement with the provision intact.  They cannot now be heard to argue that actions expressly authorized by this provision constitute a breach of the implied covenant of good faith and fair dealing.[2]

Appellants attempt to avoid the implications of this express reservation by the franchisor by focusing on the allegedly improper way in which AFC has operated the two systems.  They point to the alleged "dual-marketing strategy" of positioning Popeyes at the

---

[1]Appellants originally contended that the "develop and establish" language quoted above did not authorize AFC to "acquire" an already existing system, however, they appear to have abandoned this argument in their response brief.  In any event, we find no merit in such a crimped reading of the contract.  *C.f. Domed Stadium,* 732 F.2d at 484-85 (rejecting argument that reservation by franchisor of right to "construct and operate" additional hotels did not include right to acquire and convert existing enterprise).

[2]Appellants' reliance on cases such as *Scheck v. Burger King Corp.,* 756 F.Supp. 543 (S.D.Fla.1991), and *In re Vylene Enter., Inc.,* 90 F.3d 1472 (9th Cir.1996), is misplaced for two obvious reasons.  First, neither case deals with Louisiana law, which arguably would yield a different result in those cases.  Second, neither case concerned a contract with an express reservation by the franchisor of the right to enter the franchisees' territory and compete with them under a different set of proprietary marks.  *C.f. Domed Stadium,* 732 F.2d at 484-85 (rejecting claim for breach of good faith and fair dealing where franchise agreement reserved the right of franchisor to "construct and operate one or more [hotel] at any place other than on the site licensed").

high end and Churchs at the low end of the bone-in chicken market, the fact that Churchs restaurants more frequently receive their advertising coupons around the first of the month when lower-income families have more disposable income, and the fact that AFC requires them to carry expensive non-chicken products, while Churchs operates with a more chicken-dominated menu. They also point out that Churchs regularly advertises "dark-meat-only" specials, while AFC has repeatedly prevented them from doing so.

With the exception of some allegations that AFC shared trade and marketing secrets with competing Churchs restaurants, appellants allegations of bad faith and unfair dealing amount to little more than a complaint about the nationwide marketing and advertising plan AFC adopted for the Popeyes system. Again, however, the franchise agreements negate these claims. Section III.B of the agreements requires appellants to contribute 3 percent of their gross sales to a nationwide advertising fund and makes clear that the administrator of the fund has sole discretion in the selection of media and locale for media placement. Moreover, the agreements make clear that the sole purpose of all advertising expenditures is to benefit the Popeyes system as a whole, not any individual franchisee. Section III.B provides:

> Franchisee understands that such advertising is intended to maximize the public's awareness of Popeyes Famous Fried Chicken restaurants, and that Franchisor accordingly undertakes no obligation to insure that any individual franchisee benefits directly or on a pro rata basis from the placement, if any, of such advertising in his local market.

This provision grants AFC sole discretion over the advertising fund, and AFC was required only to administer the fund to benefit

7

the Popeyes system as a whole, without regard to appellants' franchises. Accordingly, appellants' contention that the content and timing of AFC's advertising for the Popeyes system made them less competitive in their market area does not establish bad faith or unfair dealing.

The same conclusion applies to AFC's control over appellants' menu items. Section VII.B.2 of the agreements requires appellants "to sell or offer to sell all approved [menu] items." The franchisor is not dealing unfairly or in bad faith in requiring appellants to carry the same fruit cups and specialty salads as every other Popeyes franchisee.

In sum, the franchise agreement expressly reserves to AFC the right to do precisely what appellants now charge it with: to compete against its franchisees under a different set of proprietary marks. If, as the franchise agreements make clear, AFC retains the right to develop and establish competing franchise systems, it cannot be a breach of good faith or fair dealing for it to adopt an effective marketing strategy for operating those systems.

## C.

Appellants also have failed to produce any evidence of bad faith or ill motive on the part of AFC or CIBC. *See Brill,* 727 F.Supp. at 1041 (noting that "[a] mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith"); *see also American Bank & Trust of Coushatta v. FDIC,* 49 F.3d 1064 (5th Cir.1995) (discussing

8

meaning of "good faith" under Louisiana's Civil Code). First, appellants do not allege that their Detroit-area Popeyes franchises or the competing Churchs restaurants have been treated any differently than their counterparts nationwide. Nor do they allege that AFC's marketing approach was intended or has the effect of injuring the Popeyes franchise system, and they have pointed to no reason—economic or otherwise—why AFC would favor the Churchs system over the Popeyes system. They simply complain that AFC's marketing strategy for the Popeyes system has made them less competitive in their individual market.

Second, appellants have failed to show any evidence that AFC improperly manipulated the two systems. To the contrary, uncontroverted summary judgment evidence established that the marketing departments for the Popeyes and Churchs systems are carefully segregated, that marketing policy for the two systems, other than in the broadest of senses, is made independently, and that no confidential sales information is shared between the systems. Appellants' unsupported allegations that AFC was leaking confidential marketing information to competing Churchs restaurants in their area falls far short of creating a genuine issue of material fact.[3] *See Duffy v. Leading Edge Products,* 44 F.3d 308,

---

[3]For example, while appellants allege that a manager of a local Churchs restaurant regularly had knowledge about the sales of one of their Popeyes franchises, they have produced no evidence to show that AFC was the source of the information. Appellants also allege that area Churchs restaurants were aware of their introduction of a new product, chicken tenderloins, and introduced a similar tenderloin product at the same time. Far from suggesting that AFC leaked this information to area Churchs owners, the record reflects that the Popeyes system launched its nationwide roll-out

312 (5th Cir.1995) ("[C]onclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment."); *see also Galindo v. Precision American Corp.,* 754 F.2d 1212, 1216 (5th Cir.1985).

## III.

Because the actions appellants complain of are authorized by the franchise agreements, and because appellants have failed to produce any evidence of bad faith or ill motive, the district court's grant of summary judgment in favor of AFC and CIBC was proper. We reject the remainder of appellants contentions on appeal for the reasons articulated by the district court.

AFFIRMED.

---

of its tenderloin product well in advance of the incident about which appellants complain and that appellants chose not to participate in the promotion for several months. That appellants waited to push the new product until their competitor had time to introduce a similar one is hardly evidence of bad faith on the part of AFC.